## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | Civil Action No. |
| VERIZON SOURCING LLC; CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS; VERIZON SERVICES CORP.; AND VERIZON CORPORATE SERVICES GROUP, INC.,<br><br>Plaintiffs,<br><br>-v-<br><br>VISA, INC.; VISA U.S.A. INC.; VISA INTERNATIONAL SERVICE ASSOCIATION; MASTERCARD INCORPORATED; AND MASTERCARD INTERNATIONAL INCORPORATED,<br><br>Defendants. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br><br>(Document Electronically Filed) |

## I.     PREAMBLE

1.      For decades, America's largest banks have fixed the fees imposed on Verizon (as defined below) for transactions processed over the dominant Visa and Mastercard networks and have collectively imposed restrictions on Verizon that prevents it from protecting itself against those fees. These practices continued despite the networks' and the banks' more recent attempts to avoid antitrust liability by restructuring the Visa and Mastercard corporate entities. Even after litigation, legislation, and regulation forced needed reforms on Visa and Mastercard and technology threatened to disrupt Visa and Mastercard's dominant position in the marketplace, they used their market power to continue to restrain competition, thereby harming Verizon, other Merchants, cardholders, and consumers in general, all in violation of the antitrust laws. This anticompetitive conduct has caused a Verizon to pay, and continue to pay, significant overcharges on Visa and Mastercard branded Credit and Debit Card transactions.

2.     Plaintiffs Verizon Sourcing LLC, Cellco Partnership d/b/a Verizon Wireless, Verizon Services Corp. and Verizon Corporate Services Group Inc. (collectively referred to as "Verizon") bring this action for damages under the antitrust laws of the United States against Visa Inc., Visa U.S.A. Inc., Visa International Service Association, Mastercard Incorporated, and Mastercard International Incorporated (collectively referred to as "Defendants") and alleges as follows:

## II.     INTRODUCTION

3.     Verizon operates throughout the United States and accepts Visa and Mastercard Credit Cards, Signature Debit Cards, and PIN-Debit Cards as forms of payment.

4.     Verizon challenges the Defendants' collusive and anticompetitive practices under the antitrust laws of the United States from January 1, 2004 to the present (the "Relevant Time Period"). Defendants' anticompetitive conduct harms competition and imposes upon Verizon supracompetitive, exorbitant, and collectively-fixed prices.

5.     The anticompetitive conduct alleged herein is illegal under Sections 1 and 2 of the Sherman Act.

## III.     JURISDICTION AND VENUE

6.     This Complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. Section 26, to prevent and restrain violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and for damages under § 4 of the Clayton Act, 15 U.S.C. § 15. This Court has jurisdiction over Verizon's federal antitrust claims under 28 U.S.C. §§ 1331, 1337, 2201, and 2202.

7.     Venue in the Eastern District of New York is proper under 28 U.S.C. §§ 1391, 1407 and 15 U.S.C. §§ 15, 22, and 26. Verizon operates multiple retail outlets in the Eastern District of New York and accepts payment by Visa and Mastercard Payment Cards through, for example, e-

commerce or telephone orders from cardholders located in this District. Defendants transact business and are found in the Eastern District of New York. A substantial part of the interstate trade and commerce involved in and affected by Defendants' violations of the antitrust laws was and is carried on in part within the Eastern District of New York. The acts complained of have had, and unless enjoined will continue to have, substantial anticompetitive effects in the Eastern District of New York.

## IV.    DEFINITIONS

8.    As used in this Complaint, the following terms are defined as:

a.    "Access Device" means any device, including but not limited to a Payment Card or microchip, which may be used by a consumer to initiate a General Purpose Card or Debit Card transaction.

b.    "Acquiring Bank" or "Acquirer" means a member of Visa and/or Mastercard that acquires payment transactions from Merchants and acts as a liaison between the Merchant, the Issuing Bank, and the Payment-Card network to assist in processing the payment transaction. Visa and Mastercard rules require that an Acquiring Bank be a party to every Merchant contract. In a typical payment transaction, when a customer presents a Visa or Mastercard card for payment, the Merchant relays the transaction information to the Acquiring Bank. The Acquiring Bank then contacts the Issuing Bank via the network for authorization based on available credit or funds. Acquiring Banks compete with each other for the right to acquire payment transactions from Merchants but do not

compete on the basis of the interchange fee, which is one of the subjects of this Complaint.

c.   "All-Outlets Rule" is a rule of the Visa and Mastercard networks that requires a Merchant with multiple outlets to accept Visa or Mastercard, respectively, in all of its outlets, even if those outlets are owned by a separate corporate entity, operated under a different brand name, or employ a different business model in order for the Merchant to receive the interchange rates for which the Merchant would ordinarily qualify.

d.   "Anti-Steering Restraints" are the rules of the Visa and Mastercard networks that forbid Merchants from incenting consumers to use less expensive payment forms, including: the No-Surcharge Rule; the No-Minimum-Purchase Rule; and Visa and Mastercard's "discrimination rules," which require Merchants to discriminate against other forms of payment by failing to treat them more favorably than Defendants' cards despite those competing forms' better pricing. The Defendants' standard-form Merchant agreements implement these Anti-Steering Restraints.

e.   "Assessment" refers to an amount computed and charged by Visa and Mastercard on each transaction amount to the Acquiring and Issuing Banks.

f.   "Authorization" is the process by which a Merchant determines whether a cardholder is authorized by his or her Issuing Bank to make a particular transaction. The Merchant sends the cardholder's information to its Acquiring Bank or a Third-Party Processor, which sends it to Visa or

Mastercard, which then sends it to the issuer or the issuer's processor, to obtain authorization. If authorization is given, the process is repeated in reverse.

g.  "Charge Card" or "Travel & Entertainment Card" (T&E) is an access device, usually a Payment Card, enabling the holder to purchase goods and services on credit to be paid on behalf of the holder by the issuer of such device. Typically, the contractual terms of such cards require that payment from the holder to the issuer be made in full each month, for all payments made on behalf of the cardholder by the issuer during the preceding month. The issuer does not extend credit to the holder beyond the date of the monthly statement, nor does it impose interest charges on the balance due except as a penalty for late payment. Examples of Charge Cards are the American Express Green, Gold, Platinum, and Centurion cards as well as the Diners Club and Carte Blanche cards issued by Citibank.

h.  "Credit Card" is any card, plate, or other payment code, device, credential, account, or service, even where no physical card is issued and the code, device, credential, account, or service is used for only one transaction or multiple transactions — including, without limitation, a plastic card, a mobile telephone or other mobile communications device, a fob, a home assistant or other internet-connected device, or any other current or future code, device, credential, account, or service by which a person, business, or other entity can pay for goods or services — that is

issued or approved for use through a payment network and that may be used to access a line of credit or otherwise defer payment of debt or incur debt and defer its payment, including cards commonly known as credit cards, charge cards, commercial credit cards, corporate credit cards, fleet cards, or purchasing cards.

i.   "Debit Card" is any card, plate, or other payment code, device, credential, account, or service, even where no physical card is issued and the code, device, credential, account, or service is used for only one transaction or multiple transactions — including, without limitation, a plastic card, a mobile telephone or other mobile communications device, a fob, a home assistant or other internet-connected device, or any other current or future code, device, credential, account, or service by which a person, business, or other entity can pay for goods or services — that is issued or approved for use through a payment network to debit an asset or deposit account, or that otherwise is not a Credit Card, regardless of whether authentication is based on signature, personal identification number (or PIN), or other means (or no means at all), and regardless of whether or not the issuer holds the account (such as decoupled debit), including cards commonly known as signature or offline debit cards, PIN or online debit cards, gift cards, or other prepaid cards.

j.   "General Purpose Cards" collectively refers to Credit Cards and Charge Cards.

k.  The "Honor All Cards" Rules are rules of the Visa and Mastercard networks that require any Merchant that accepts Visa or Mastercard Credit Cards to accept all Credit Cards that are issued on that network, and the rules of the Visa and Mastercard networks that require any Merchant that accepts Visa or Mastercard Debit Cards to accept all Debit Cards that are issued on that network.

l.  "Interchange Fee" in the United States General Purpose Card Network Services and Debit Card Network Services markets means a fee that Merchants pay to the Issuing Bank through the network and the Acquiring Bank for each transaction in which the Issuer's card is used as a payment device. The following example illustrates how the Visa and Mastercard Interchange Fees work. A customer presents a Visa or Mastercard card to Verizon as a payment method. Verizon contacts the Acquiring Bank, itself or through a Third-Party Processor, to authorize the transaction. The Acquiring Bank submits the transaction to the network. The network relays the transaction information to the Issuing Bank or the Issuing Bank's Third-Party Processor, which approves the transaction if the customer has a sufficient line of credit or available funds. If the transaction is authorized through the network, the Issuing Bank pays the Acquiring Bank the payment amount minus the "Interchange Fee," which is fixed by the Member Banks of Visa and Mastercard. The Acquiring Bank then pays Verizon the payment amount minus the Interchange Fee and other charges for processing the

transaction. The total fee charged Merchants, like Verizon, is often referred to as the "Merchant-Discount Fee." The Interchange Fee is the largest component of the Merchant-Discount Fee.

m.  "Issuing Bank" or "Issuer" means a member of Visa and/or Mastercard that issues Visa and/or Mastercard branded Payment Cards to consumers for their use as payment systems and access devices. Issuing Banks compete with each other to issue Visa and Mastercard cards to consumers. Visa and Mastercard rules require that all Member Banks issue, respectively, Visa and Mastercard Payment Cards.

n.  "Merchant" means an individual, business, or other entity that accepts payments in exchange for goods or services rendered, as donations, or for any other reason. Verizon is a Merchant.

o.  "Merchant-Discount Fee" is the total sum that is deducted from the amount of money a Merchant receives in the settlement of Visa and/or Mastercard transactions. The largest component of the Merchant-Discount Fee is the Interchange Fee.

p.  "Miscellaneous Exclusionary Restraints" refer collectively to the All-Outlets Rule, the No-Bypass Rule, and the No-Multi-Issuer Rule.

q.  "Network Services" means the services and infrastructure that Visa and Mastercard and their members provide to Merchants through which payment transactions are conducted, including authorization, clearance, and settlement of transactions, and those similar services offered by American Express and Discover. As they currently are offered by Visa

and Mastercard and their Member Banks, Network Services include Network- Processing Services and the Visa and Mastercard Payment-Card Systems that facilitate acceptance of Visa and Mastercard Payment Cards by Merchants. "Network Services" are sometimes referred to as "Card Acceptance Services" as they relate to Merchants.

r.  "Network-Processing Services" are the services that are or may be used for authorizing, clearing, and settling Visa and Mastercard Credit and Debit Card transactions.

s.  "No-Minimum-Purchase Rule" is a rule of the Visa and Mastercard networks that prohibits Merchants from imposing minimum-purchase amounts for Visa and Mastercard Credit-Card purchases.

t.  "No-Bypass Rule" is a rule of the Visa and Mastercard networks that prohibits Merchants and Member Banks from bypassing the Visa or Mastercard system (thereby avoiding the supracompetitive Interchange Fees) in order to clear, authorize, or settle Credit Card transactions even if the Issuing and Acquiring Banks are the same, or even if a Third-Party Processor has agreements with both the Issuing and Acquiring Banks on any given transaction.

u.  "No-Multi-Issuer Rule" is a rule of the Visa and Mastercard networks respectively, that prohibits Visa and Mastercard transactions from also being able to be processed over other networks.

v.  "No-Surcharge Rule" is a rule of the Visa and Mastercard networks that forbids Merchants from charging cardholders a surcharge on their

Payment-Card transactions to reflect cost differences among various payment methods. For example, Merchants are prohibited from surcharging cardholders who use a Visa Credit Card rather than a Discover-branded Credit Card, or use a Premium Credit Card rather than a standard Credit Card, or use a Credit Card rather than another form of payment.

w.   "Signature Debit Card" or "Offline Debit Card" is a Debit Card with which the cardholder authorizes a withdrawal from his or her bank account usually by presenting the card at the POS and signing a receipt. Signature Debit Card transactions are processed through signature networks, like Credit Card transactions. Examples of Signature Debit Cards include Visa's "Visa Check" product and Mastercard's "Debit Mastercard" product.

x.   "Online PIN-Debit Card" or "PIN-Debit Card" is a Debit Card with which the cardholder authorizes a withdrawal from his or her bank account by swiping her card at the POS and entering a Personal Identification Number ("PIN"). PIN-Debit Card networks grew out of regional ATM networks and therefore process transactions differently than Offline transactions. Examples of Online PIN-Debit Card networks include Interlink, Maestro, NYCE, and Pulse.

y.   A "Premium Card" is a General Purpose Card that carries a higher Interchange Fee than a Standard Card and is required by a network to carry a certain level of rewards or incentives to the cardholder. Visa's

-10-

"Visa Signature," "Visa Rewards," and "Visa Infinite" card products and Mastercard's "World" and "World Elite" card product are examples of Premium Cards.

z.   "On-Us Transactions" are transactions in which the Acquiring Bank and the Issuing Bank are the same. Even when the Issuing and Acquiring Banks are identical, Visa and Mastercard require that the Issuing Bank charge an Interchange Fee to the Merchant.

aa. "Payment Card" refers to a plastic card that enables consumers to make purchases from Merchants that accept the consumer's Payment Card. The term "Payment Card" refers to several different types of cards, including General-Purpose Cards, Debit Cards, Travel & Entertainment Cards, stored-value cards, and Merchant-proprietary cards. Although "Payment Cards" are a subset of "Access Devices," the two terms are used interchangeably herein, because despite evolving technology, Payment Cards continue to constitute the vast majority of Access Devices.

cc. "Settlement" is the process by which the Merchant is reimbursed for a Payment Card transaction. While Visa and Mastercard rules require that an Acquiring Bank be a party to all Merchant card-acceptance agreements, Merchants often use Third-Party Processors to process these transactions. The Acquiring Bank or its processor credits the Merchant's bank account with the amount paid by the cardholder less the Merchant-Discount fee, the largest component of which is the Interchange Fee, and

then transmits the transaction data to Visa or Mastercard, which sends it to the Issuing Bank or its Third-Party Processor. The Issuing Bank then sends payment to the Acquiring Bank through Visa or Mastercard (and possibly the Acquirer's processor). In a Credit Card or Signature Debit Card transaction, settlement occurs two to four days after authorization and clearing. In a PIN-Debit transaction, all three processes occur in the same electronic transaction virtually instantaneously.

dd. "Third-Party Processor" is a firm, other than Visa, Mastercard, a Member Bank, or an entity affiliated with a Member Bank, that performs the authorization, clearing, and settlement functions of a Visa or Mastercard Payment-Card transaction on behalf of a Merchant or a Member Bank.

## V.    THE PARTIES

9.    Plaintiff Verizon Sourcing LLC is a limited liability company incorporated under the laws of Delaware. Verizon Sourcing's principal place of business is One Verizon Way, Basking Ridge, NJ 07920. Plaintiff Cellco Partnership d/b/a Verizon Wireless is a General Partnership incorporated under the laws of Delaware. Cellco Partnership d/b/a Verizon Wireless's principal place of business is One Verizon Way, Basking Ridge, NJ 07920. Plaintiff Verizon Services Corp. is a corporation incorporated under the laws of Delaware. Verizon Services Corp.'s principal place of business is 22001 Loudon County Parkway; Ashburn, VA 20147. Plaintiff Verizon Corporate Services Group Inc. is a corporation incorporated under the laws of Delaware. Plaintiff Verizon Corporate Services Group Inc.'s principal place of business is One Verizon Way; Basking Ridge, NJ 07920.  Plaintiffs Verizon Sourcing LLC, Cellco Partnership d/b/a Verizon Wireless, Verizon Services Corp. and Verizon Corporate Services Group Inc. are collectively

referred to herein as "Verizon." Verizon accepts payment by Visa and Mastercard Credit and Debit Cards. Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and Mastercard transactions on Verizon and force Verizon to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. Verizon has been and continues to be injured in its business or property as a result of the unlawful conduct alleged herein.

10.     Defendant Visa Inc. operates the Visa electronic payments network around the world. It is a publicly-traded Delaware Corporation with its principal place of business in Foster City, California. Until the Visa corporate restructuring described below, Defendant Visa International (f/k/a Visa International Service Association) was a non-stock, non-assessable Delaware membership corporation with its principal place of business in San Francisco, California. Before the restructuring, Defendant Visa U.S.A. Inc. was a group-member of Visa International Service Association and was also a non-stock, non-assessable Delaware membership corporation with its principal place of business in San Francisco, California. Visa Inc. is the successor in interest to Visa U.S.A. Inc. and Visa International (f/k/a/ Visa International Service Association). Defendants Visa U.S.A. Inc., Visa International Service Association (a/k/a Visa International), and Visa Inc. are collectively referred to herein as "Visa."

11.     Defendant Mastercard Incorporated is a publicly-traded Delaware corporation with its principal place of business in Purchase, NY. Mastercard Incorporated is the successor in interest to a private, SEC-registered share company, also called Mastercard Incorporated, organized under the laws of Delaware with its principal place of business in Purchase, New York. Defendant Mastercard International Incorporated is a Delaware membership corporation that is the principal

operating subsidiary of Mastercard Incorporated. Mastercard Incorporated and Mastercard International Incorporated are collectively referred to herein as "Mastercard."

12.     Acquiring Banks enter into acceptance contracts with Verizon agreeing either implicitly or explicitly that Visa and Mastercard's uniform schedule of Interchange Fees will apply to all Verizon transactions that are initiated by Visa or Mastercard Payment Cards. These Acquiring Banks understand that the same uniform schedule of Interchange Fees will be applied to Verizon transactions conducted by all other Acquiring Banks. Issuing Banks enter into issuing contracts with Visa and Mastercard, agreeing and understanding that they will receive Interchange Fees from Verizon based on the Visa and Mastercard's uniform schedule of Interchange Fees.

## VI.     CO-CONSPIRATORS

13.     The Court of Appeals for the Second Circuit held that Visa and Mastercard "are not single entities; they are consortiums of competitors." *United States v. Visa U.S.A. Inc.*, 344 F.3d 229, 242 (2d Cir. 2003). Before the corporate restructuring described below, they were "owned and effectively operated by over 22,000 banks, which compete with one another in the issuance of Payment Cards and the acquiring of Merchants' transactions." *Id.* Because of this judgment, among other things, the networks and their Member Banks recognized that the networks were "structural conspiracies" and "walking conspiracies."

14.     Various persons, firms, corporations, organizations, and other business entities, some unknown and others known, have participated as co-conspirators in the violations alleged and have performed acts in furtherance of the conspiracies. Co-conspirators include, but are not limited to, the following: (a) Issuing Banks that have issued Visa and/or Mastercard Credit and Debit Cards and have agreed to charge uniform, collectively fixed Visa and Mastercard Interchange Fees for Verizon and other Merchants and transactions both before and after Visa and

Mastercard's restructurings; (b) Acquiring Banks that acquire Visa and Mastercard transactions, as described herein, and that have participated in the conspiracy to collectively fix Interchange Fees both before and after the Visa and Mastercard's restructurings; and (c) certain banks that are or were members of the Boards of Directors of Visa or Mastercard and adopted and agreed to fix Interchange Fees for Verizon and other Merchants and transactions, to impose the anticompetitive Anti-Steering Restraints and Miscellaneous Exclusionary Restraints alleged herein, and also designed and authorized the restructurings that themselves violate the antitrust laws.

## VII.    TRADE AND INTERSTATE COMMERCE

15.    The trade and interstate commerce relevant to this action consists of the Relevant Markets described herein.

16.    During all or part of the Relevant Time Period, each of the Defendants, directly or through their affiliates or subsidiaries, participated in the Relevant Markets described herein in a continuous and uninterrupted flow of interstate commerce.

17.    The activities of Defendants and their co-conspirators, as described herein, were within the flow of and had a substantial effect on interstate commerce.

## VIII.   FACTUAL ALLEGATIONS

### A.    Evolution of the Visa and Mastercard Networks.

18.    Visa and Mastercard (collectively the "Networks") are international bank-card networks whose members include banks, regional-banking associations, and other financial institutions. They were established by their members to develop, promote, and operate national Credit Card networks for the purpose of, among other things, enabling Issuing Banks to extract fees from Merchants with whom they have no business relationships.

19.    Visa and Mastercard evolved from regional and local Credit Card systems formed during the 1960s.

20.     During the early years of Visa and Mastercard, Merchants that accepted Credit Cards used paper forms called "drafts" to conduct transactions.

21.     In the mid-1980s, technology evolved such that many transactions were processed electronically and paper drafts were not needed for most Payment Card transactions. Since that time, the costs to Visa and Mastercard of the various components of Credit Card transaction processing (for example, computer hardware, telephone service, network service, and data-processing services) have decreased significantly. These changes led to significant reductions in the costs for Visa and Mastercard of processing Payment Card transactions.

22.     As Visa and Mastercard began operating on a national scale, use of their cards has increased dramatically.

23.     Since 1970, the number of Visa Member Banks has increased from approximately 1,400 to nearly 14,000 in the United States and over 22,000 worldwide. U.S. consumers now carry more than 802 million Visa-branded Credit, Debit, commercial, and prepaid cards.

24.     Mastercard has experienced similar growth and now includes more than 23,000 Member Banks worldwide. As of today, there are more than 360 million Mastercard-branded cards in circulation in the United States.

25.     Visa and Mastercard have also experienced substantial consolidation among their Member Banks.

26.     The evolution of Visa and Mastercard through horizontal agreements stands in contrast to the development of American Express, Discover, and other "three-party" networks, which built Merchant- and cardholder bases independently of a cooperating partner on the other "side" of the platform. In a three-party network such as American Express or Discover, the network

operator acts both as the Issuer and Acquirer for the vast majority of transactions involving its cards and is the only intermediary between the Merchant and the cardholder.

27.     When a three-party network sets Merchant and cardholder fees, it does so to maximize its own profit, rather than to increase the profits of the actors on one side (i.e., the Issuing Banks) of the platform, as is the case in five-party networks.

**B.      Interchange Fees in the Context of a Payment-Card Transaction.**

28.     Visa and Mastercard operate as standard-setting organizations with respect to General Purpose Card Network services, Signature Debit Card Network Services and PIN-Debit Card Network Services that facilitate the exchange of transaction data and funds among Merchants, Acquiring Banks, Issuing Banks, and consumers.

29.     When a consumer makes a payment with a Credit or Signature Debit Card, the Merchant sends an electronic transmission to its Acquiring Bank or Third-Party Processor. The Acquiring Bank or processor then sends an electronic transmission to the Visa or Mastercard networks. The networks relay the transaction to the cardholder's Issuing Bank or its Third-Party Processor, which makes a payment to the Acquiring Bank, through the networks for the purchase amount minus the Interchange Fee. The Acquiring Bank then credits the Merchant's account for the transaction amount minus the Merchant-Discount Fee, the largest component of which is the Interchange Fee. Finally, the Issuing Bank charges the cardholder's credit account for the full amount of the purchase. Under this system, the Issuing Bank earns revenue from annual fees and interest charged to cardholders, as well as the amount of the Interchange Fee, while the Acquiring Bank earns revenue from the difference between the Merchant-Discount Fee and the Interchange Fee.

30.     Visa Product and Service Rule 9.1.1.3 provides that "Interchange Reimbursement Fees are determined by Visa and provided on Visa's published fee schedule." These Interchange Fees apply on every transaction, except for where they have been "customized where Member [Banks] have set their own financial terms for the Interchange of a Visa Transaction or Visa has entered into business agreements to promote acceptance and Card usage."

31.     Similarly, Mastercard Rule 8.3 provides that "[a] transaction settled between [Member Banks] gives rise to the payment of the appropriate interchange fee or service fee, as applicable. [Mastercard] has the right to establish default interchange fees and default service fees . . . ., it being understood that all such fees set by [Mastercard] apply only if there is no applicable bilateral interchange fee agreement between two [Member Banks] is in place, any intraregional or interregional fees established by [Mastercard] are binding on all [Member Banks]."

32.     Despite the theoretical deviations from "default" Interchange Fees that Mastercard's rules permit, the Merchant Restraints ensure that the "default" rates set the prices that all Issuing Banks charge Merchants that accept their cards. Because of the Restraints, bilateral negotiations between a Merchant, or group of Merchants, and an Issuer simply do not occur.

33.     The Default Interchange Rules were adopted when Visa and Mastercard were owned and controlled by Defendants and other Member Banks and continually reaffirmed by votes of Visa and Mastercard's Boards of Directors that consisted of Member Banks. Defendants adopted those rules with the purpose and effect of inflating Merchants' costs of accepting Payment Cards and using the ill-gotten profits from those Interchange Fees to line the pockets of the Member Banks.

34.     Visa and Mastercard each have established complex "default" Interchange Fee schedules. Default Interchange includes the fee levels, the structure of the fees, such as the

Interchange-Fee categories that are tiered by Merchant type, card type, and the Merchant's transaction volume, among other things. Interchange fees account for the largest portion of Merchant costs for accepting such cards, and Verizon is no exception. Interchange fees account for the largest portion of Verizon's costs for accepting such cards.

35.     Until the restructurings described below, Visa and Mastercard's uniform schedules of Default Interchange Fees were adopted regularly—usually semiannually—by vote of the competing Member Banks that occupied the seats on Visa and Mastercard's Boards.

36.     A typical transaction is depicted below:



37.     When a consumer makes a payment with a PIN-Debit card, the consumer swipes a Payment Card at a POS terminal and enters a personal identification number ("PIN") on a numeric keypad. After the PIN is entered, the POS terminal transmits the transaction and Payment-Card information to an Acquiring Bank or Third-Party Processor acting on the bank's behalf. The

Acquiring Bank or processor then sends the information to the PIN-Debit network, which then switches the transaction to the Issuing Bank or a Third-Party Processor acting on its behalf. The Issuing Bank or its processor assesses the consumer's account to verify the PIN and ensure that the consumer has sufficient funds to pay for the purchase. Next, the Issuing Bank or its processor sends an electronic message to the PIN-Debit network, which indicates acceptance or rejection of the transaction for the purchase amount minus the Interchange Fee. The PIN- Debit network switches the Issuing Bank's reply back to the Merchant through the Acquiring Bank or its processor to complete the transaction. This entire "authorization" process takes place in just seconds. In the same transaction, the Merchant's acquirer "purchases" the transaction from the Merchant, guaranteeing payment and facilitating settlement of the transaction.

38. This process changes somewhat in a Mobile-Payment transaction (a transaction initiated on a Mobile Device). For these transactions, the user sets the Mobile  Device to conduct Mobile-Payment transactions by enabling a setting on his device and providing the manufacturer of the mobile platform (such as Apple, Android, or Microsoft) with the account information for the Payment-Card accounts that he wants to use in Mobile-Payment transactions. The mobile platform communicates this request to the user's Issuing Bank, which communicates with the network to create a user-specific identifier, which is then embedded into the secure portion of the memory chip in the Mobile Device. At the POS, the user presents the Mobile Device and starts the transaction by using an alphanumeric password or a biometric identifier, such as a fingerprint. A request to authorize the transaction is then sent from the POS to the Acquirer, and to the network, as in a plastic-card-based transaction. Upon receiving the data, the network looks up the user's identifier, which it then inserts into the authorization request to the Issuer, which approves or denies the transaction. Notwithstanding the presence of a Mobile Device and the additional

security features of a Mobile-Payment transaction, the Defendants' anticompetitive rules such as the Default Interchange Rules, the Honor-All-Cards Rules, and the Anti-Steering Restraints apply in full force, just as in plastic-card-based transactions.

39.     The below example demonstrates how a Mobile-Payment transaction functions on the Apple Pay platform:



40.     The Networks monitor and enforce their Member Banks' compliance with the uniform schedule of default Interchange Fees. Visa and Mastercard's IT systems monitor each transaction to ensure that the "correct" default interchange rate is being applied. Thus, if the Acquiring Bank attempted to "cheat" on a particular transaction by applying an interchange rate lower than the default rate, Visa and Mastercard's systems would intervene and increase the interchange rate to the default rate. These same IT systems, however, have the capacity to facilitate literally millions of bilateral agreements between Issuers and Merchants.

41.     Visa and Mastercard rules also require that a Member Bank be a party to all or nearly all Merchant contracts for the acceptance of Visa and Mastercard Payment Cards. This rule applies even to Merchants and banks that use "Payment Facilitators" such as Third-Party Processors or Independent Sales Organizations. Payment Facilitators are obligated by Visa and Mastercard to include terms in their agreements with Merchants, including the obligation to abide by all Visa or Mastercard Rules. See Visa Core Rule 1.5.2.1; Visa Product and Service Rule 5.3.1; Mastercard Rules 7.2.1 & 7.6.

42.     Visa and Mastercard do not use the Interchange Fee to fund their operations. Rather, the Interchange Fee is retained by the Issuing Bank on every transaction. The majority of Visa and Mastercard revenues are derived from fees and Assessments that Visa and Mastercard charge Member Banks.

43.     The Networks can and do perform their functions of authorizing and clearing Credit-Card and Debit-Card transactions, acting as standard-setting entities for Credit and Debit Card transactions, promoting their respective networks, and paying other operating expenses through the operations fees and Assessments that their Member Banks pay. Interchange Fees are not necessary to perform these functions.

44.     Before their respective IPOs, Visa and Mastercard did not act as single entities when their Member Banks collectively fixed uniform schedules of Default Interchange Fees and agreed to impose those fixed prices on Merchants, like Verizon. The Visa and Mastercard Member Banks were direct, horizontal competitors and did not ever share a unity of interest and did not owe a fiduciary duty to each other or The Networks with respect to setting Interchange fees.

45.     The Member Banks did not pool all of their assets to form or operate the Visa and Mastercard networks.

-22-

46. Before the Visa and Mastercard IPOs, the Member Banks did not owe a fiduciary duty to each other or the Visa and Mastercard networks with respect to the setting of Interchange Fees.

47. The Member Banks of Visa and Mastercard impose Interchange Fees on Merchants even for On-Us Transactions, in which the Issuing and Acquiring Banks are the same bank. In such a situation, the network certainly does not need to "balance" the cardholder and Merchant "sides" of a transaction, because the Member Bank on both sides is the same. If that Member Bank believed that some "balancing" were needed, that bank could independently set a transfer price, rather than relying on price set by the Visa and/or Mastercard network.

48. Before the Visa IPO, certain bank members of Visa, acting by and through the Visa Board of Directors, fixed uniform Interchange Fees for various Merchants and transactions for all Visa General Purpose Card and Debit Card transactions, and agreed to impose those price-fixed fees on Merchants, like Verizon.

49. Before the Mastercard IPO, certain bank members of Mastercard, acting by and through the Board of Directors of Mastercard, then set similar uniform Interchange Fees for various Merchants and transactions for all Mastercard General Purpose Card and Debit Card transactions that they agreed to impose upon Merchants.

50. Interchange Fees were devised in the early days of Visa and Mastercard. Interchange Fees purportedly helped pay for the costs of initial card issuance, marketing, transferring transactional paper (which at that time literally was paper) between Acquiring and Issuing Banks, and purportedly balanced network costs between Issuers and Acquirers. These early Interchange Fees were cost-based, and in the case of Visa, set with the help of independent auditing firms.

-23-

51.     Credit-Card Interchange Fees were purportedly necessary in the early days of Visa and Mastercard to incentivize banks to issue Credit Cards to cardholders.

52.     Even if those initially proffered justifications for collectively set, uniform schedules of Default Credit-Card Interchange Fees once were valid, they no longer are valid. Interchange Fees are no longer cost-based, and Visa and Mastercard no longer need to incent card issuance to establish their networks. They are nothing more than a fixed fee imposed on Merchants, like Verizon.

53.     Technology has greatly evolved since the early days Visa and Mastercard, such that they now have the technological capability to facilitate bilateral agreements among Issuing Banks, Acquiring Banks, and Merchants and to facilitate the settlement of funds pursuant to those bilateral agreements.

54.     Issuers, for their part, have the technological capability to process bilateral agreements with Merchants and to settle transactions pursuant to those bilateral agreements.

55.     Unlike in the early days of the networks, Visa and Mastercard now, jointly and separately, have market power with respect to both Credit Cards and Debit Cards. Even in the face of frequent and significant increases in Interchange Fees, Verizon has no choice but to continue to accept Visa's and Mastercard's dominant Credit Cards. *See United States v. Visa*, 163 F. Supp. 2d at 340, aff'd, 344 F.3d at 240; *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, (E.D.N.Y. Apr. 1, 2003). In recent years both Visa and Mastercard repeatedly and substantially increased the total Interchange Fees charged to and paid by Merchants, but did not experience any decline in Merchant acceptance.

56.     The collective setting of Interchange Fees neither performs the standard-setting function of Visa and Mastercard, nor enables them to perform that function.

57.     In 2010, the Department of Justice concluded that Visa and Mastercard possess market power. See Comp. Impact Stmt. at 6, *United States v. Am. Express Co.*, No. 1:10-cv-4496 (E.D.N.Y. Oct. 4, 2010). The DOJ found that the No-Discount Rule and other Anti-Steering Restraints reinforce this market power by coercing Merchants into an "all-or-nothing" choice, wherein they have no ability to adjust acceptance in response to cost.

58.     Therefore, given the ubiquity of Visa and Mastercard Payment Cards, banks now would find it in their best interest to issue Visa and Mastercard Payment Cards and acquire Merchants for the networks, even without the promise of supracompetitive Interchange Fee revenues.

**C.      Visa and Mastercard Leveraged their Dominance in Credit Cards to Become the Dominant Debit-Card Networks.**

59.     Visa and Mastercard initiated their Visa Check and MasterMoney (the predecessor to Mastercard Debit) programs in 1979. Signature Debit Card transactions represented only a small portion of all Payment Card transactions.

60.     At that time, PIN-Debit networks were beginning to spring up from regional ATM networks. Initially, PIN-Debit networks operated without Interchange Fees, or with "negative" Interchange Fees, whereby the Merchant received a small sum of money on each transaction to incent it to install PIN pads, the equipment necessary at the POS for a Merchant to accept a PIN-Debit transaction.

61.     The Interchange-Fee-free period of PIN-Debit networks came to a close, however, when Visa acquired the Interlink network and soon thereafter imposed an Interchange-Fee rate equivalent of 45 cents on a 100 dollar purchase.

62.     Signature Debit Cards carried higher Interchange Fees than PIN-Debit Cards, and therefore were slow to gain Merchant acceptance. Accordingly, in the early 1990s, PIN-Debit transactions accounted for more Debit Card transactions and were anticipated to increase.

63.     Because of the rapid growth in PIN-Debit transactions and the superiority of the PIN-Debit product, Visa's advisors predicted that PIN-Debit would wipe out Signature Debit.

64.     PIN-Debit also had the potential to eat into Credit-Card transaction volume, and thereby drive down Credit-Card Interchange Fees. Visa and Mastercard viewed the Regional PIN-Debit networks as potential threats to their dominance in the payments marketplace.

65.     To counteract the slow growth in Merchant acceptance of Offline-Debit Cards, Visa and Mastercard required Merchants that accepted their dominant Credit Cards to also accept their Signature Debit Cards.

66.     By tying their Signature Debit Cards to their dominant Credit Cards, Visa and Mastercard drastically increased the number of Visa Check and MasterMoney cards in circulation.

67.     The tying practices described above led to a lawsuit by a class of Merchants, in which this Court granted partial summary judgment for the class and denied summary judgment for the defendants. *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003).

68.     After the court's summary-judgment ruling in Visa Check, Visa and Mastercard entered into settlement agreements with the class, which required Visa and Mastercard to abandon the part of their "Honor All Cards" rules that required Merchants that accepted Visa and Mastercard Credit Cards to also accept Visa and Mastercard's Signature Debit Cards.

69.     Visa, fearing that Merchants would abandon its more expensive Signature Debit cards, used its market power to cause "convergence" of PIN-Debit and Signature Debit

Interchange Fee rates. Through this "convergence" strategy, Visa sought to increase the Interchange Fee levels on its Interlink PIN-Debit transactions both to decrease the incentive of Merchants to steer consumers to PIN-Debit transactions away from Signature Debit transactions and to incent banks to issue Interlink cards. Visa's ultimate goal is to eliminate the competitive threat of PIN-debit networks that are not dominated by Visa Member Banks by making Merchants indifferent at the POS between PIN-Debit and Signature Debit.

70.     Visa has offered incentives to Issuing Banks to become exclusive issuers of Interlink PIN-Debit Cards. Although Mastercard has at times provided superior economic offers to these banks for issuance of Maestro PIN-Debit cards, banks have been migrating to Interlink, based on Visa's promise that once Interlink achieves a significant share of Debit Card transactions, Visa will gain greater pricing power. With this increased pricing power in hand, Visa plans to expedite the "convergence" in Interchange rates between PIN-Debit and Signature Debit transactions, which will permanently marginalize the competitive threat from the PIN-Debit networks.

**D.     Verizon directly pays Interchange Fees.**

71.     Visa Inc.'s Core Rule 1.1.9.1 states that Member Banks are solely responsible for their "issuance of Visa products and acquiring of Merchants to accept Visa products, including for settlement of transactions, compliance with the Visa Charter Documents and the Visa International Operating Regulations…" Core Rule 1.1.9.1 further specifies that Member Banks "indemnify Visa for claims or liabilities that arise out of their issuance of Visa products and acquiring of Merchants, and broadly disclaim liability against Visa for such activities." Thus, if a Visa Member Bank determined that it was harmed by the uniform schedules of Default Interchange Fees, Core Rule 1.1.9.1 prevents it from suing Visa.

72.     Mastercard's Rule 2.3 states that "IN NO EVENT WILL THE CORPORATION BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, FOR LOSS OF PROFITS, OR ANY OTHER COST OR EXPENSE INCURRED BY A CUSTOMER OR ANY THIRD PARTY ARISING FROM OR RELATED TO USE OR RECEIPT OF THE SYSTEMS, WHETHER IN AN ACTION IN CONTRACT OR IN TORT…" (capitalization in original). Thus, if a Mastercard Member Bank determined that it was harmed by the uniform schedules of Default Interchange Fees, Rule 2.3 prevents it from suing Mastercard.

73.     In a technical manual issued to its Member Banks, Mastercard states that "Mastercard shall have no liability to any member, member processor, or other person acting on behalf of the member for any loss, cost, or other damage arising out of or in connection with Mastercard's administration of or any member's participation in any interchange rate program." Mastercard Int'l, GCMS Reference Manual.

74.     Even if Visa and Mastercard Member Banks were not explicitly prevented from suing Visa and Mastercard over the uniform schedules of Interchange Fees, they have no incentive to do so.

75.     The Bylaws of Visa U.S.A. require that all "Principal Member [Banks]," which include the Bank-Defendant members of Visa U.S.A. and the vast majority of all Member Banks, "[s]hall issue Cards bearing the Visa service mark." Visa U.S.A., Bylaws § 2.04(a) (May 15, 2004).

76.     Similarly, Mastercard's Rule 3.1 requires that Member Banks "must have issued and outstanding a reasonable number of Mastercard Cards." If a Member Bank fails to issue the requisite number of cards, it will be assessed a penalty by Mastercard. The reason for these provisions is for all Member Banks to have a common economic interest in ever-rising Interchange Fees.

77.     Because all Member Banks are required to issue Visa or Mastercard Payment Cards, all Member Banks benefit from the supracompetitive Interchange Fees that they agree to abide by and, at least until Visa and Mastercard's reorganizations, collectively set. Moreover, because acquiring banks do not pay Interchange Fees, they have no economic incentive to sue over the Interchange Fees.

78.     Acquiring banks do not pay Interchange Fees. These banks do not view Interchange Fees as a "cost" but rather account for them as contra-revenue.

79.     Before the IPOs, the Member Banks appointed Visa and Mastercard's Boards of Directors and approved of and agreed to abide by Visa and Mastercard's rules and bylaws. Before the IPOs, the Member Banks conspired with each other and with Visa and Mastercard to collectively fix uniform schedules of default Interchange Fees. At all times relevant to these claims, the Member Banks have agreed to abide by the rules of Visa and Mastercard, including the rules that require the application of a default Interchange Fee on every Visa and Mastercard transaction. Third-Party Processors do not pay Interchange Fees and therefore have not been harmed by the imposition of those fees.

80.     As a result, Third-Party Processors do not have any practical incentive or ability to seek redress for Visa and Mastercard's supracompetitive Interchange Fees.

81.     Therefore, no realistic possibility exists that any Third-Party Processor will sue Visa or Mastercard over any of the practices described in this Complaint.

82.     Issuing Banks account for interchange fees as revenue, while Merchants, like Verizon, account for them as an expense. In contrast, acquiring banks do not account for interchange fees as revenue nor an expense.

83.    The following illustration shows how the acquiring bank accounts for the amounts due from the Issuing Bank:



United States Government Accountability Office Report, "Example of a Typical Credit Card Purchase Transaction Showing How Interchange Fees Paid by Merchants Are Allocated."

84.    The fees detailed above are taken out of the total amount of the transaction between the cardholder and merchant. Thus, in both substance and form, Verizon pays all fees, including the interchange fee, which is collected by the issuer. As indicated in the diagram above, Verizon would not make payments for the services provided by the card system in a typical fashion – it does not receive a standard bill for services. Instead, each party deducts its fee as the funds flow through the system.

**E.    Visa and Mastercard Require the Payment of an Interchange Fee on Every Transaction.**

85. Before the IPOs, certain Member Banks, acting through the Visa and Mastercard Boards of Directors, collectively adopted and enforced rules that require the payment of an Interchange Fee, set at Visa and Mastercard's uniform levels, for all transactions on the respective networks. After the IPOs, certain Member Banks agreed to continue to abide by these rules. These unlawful agreements are enabled by other rules that were also collectively adopted and continue to be collectively enforced by the Member Banks.

86. Both Visa and Mastercard enforce "Honor All Cards" Rules that require Merchants that accept any Visa or Mastercard-branded Payment Card to accept all Payment Cards bearing that brand, regardless of the identity of the Issuing Bank, the Card Product, or the cost of accepting that card. With respect to Visa, that rule is reflected in, for example, Visa Core Rules 1.5.4 and 5.4.1.1. With respect to Mastercard, the Honor All Cards Rule is embodied in, for example, Rule 5.10.1.

87. By enacting and enforcing the "Honor All Cards" and Interchange Fee payment rules noted above, the Defendants have created a situation in which the payment of an Interchange Fee is required on all transactions, regardless of the Issuing Bank. Because of this problem – a problem entirely of Defendants' own creation – Defendants now claim that uniform schedules of "fall back" or "default" Interchange Fees actually benefit Merchants by preventing the Issuing Bank from "holding up" the Merchant by demanding an Interchange Fee that is as high as the Issuer would like, knowing that the Honor All Cards rule prevents the Merchant from refusing that transaction.

88. This defense of Visa and Mastercard's anticompetitive practices does not stand up to scrutiny. In fact, those practices reinforce the networks' and banks' market power over Merchants by making it virtually impossible for Merchants or groups of Merchants to exert any

leverage over Visa or Mastercard Member Banks in order to obtain more favorable prices or terms. But for the rules described in this section and the Anti-Steering Restraints, Merchants (like Verizon) would have the option to reject a given Visa or Mastercard payment card for a given transaction if the benefit the Merchant receives from accepting the card or allowing the transaction is not commensurate with the associated Merchant fee or imposing a Surcharge or giving a discount, depending on the cardholder's choice of payment.

F.      **The Anti-Steering Restraints Insulate Visa and Mastercard from Competition in the Relevant Markets and Maintain Supracompetitive Prices.**

89.     Cardholders do not know the costs of the Interchange Fees and Merchant-Discount Fees paid by Verizon, and Verizon, like other Merchants, is unable to assist them in choosing the most cost- effective payment methods.

90.     Beginning at their inception, Visa and Mastercard enforced "No Surcharge Rules" that prohibited Merchants from imposing a Surcharge on a transaction made with a Card that bore a particular Brand, Product, or Issuing Bank.

91.     The Honor-All-Cards Rule, the No-Surcharge Rule and the Anti-Steering Restraints were adopted when Visa and Mastercard were owned and controlled by the Member Banks and continually reaffirmed by votes of Visa and Mastercard's Boards of Directors that consisted of Member Banks. Defendants adopted these Rules with the purpose and effect of inflating Interchange Fees and impairing competition.

92.     By implementing and enforcing these rules, Visa and Mastercard fully insulated themselves from any competitive threat. Because it is the cardholder who selects which card to use in making a purchase, the No-Surcharge Rule and other Anti-Steering Restraints guaranteed that the consumer would make this selection without regard to the cost to Verizon of accepting the card.

93.     Before these rules were reformed by the prior settlement in this case, the DOJ Consent Decree, and the Durbin Amendment, they were embodied in, for example, Visa U.S.A. Op. Reg. 5.2F (2006) and Mastercard Op. R. 9.12 (2006).

94.     On January 27, 2013, Visa and Mastercard altered their rules as required by the preliminary approval of the 2012 settlement of this action, to permit surcharging of Credit-Card transactions under certain circumstances. Debit-Card transactions cannot be surcharged unless the Interchange-Fee caps contained in the Durbin Amendment to the Dodd-Frank Act are repealed. Now that the settlement has been vacated by the Court of Appeals for the Second Circuit, the Defendants may impose their No-Surcharge Rules in their pre-settlement form at any time.

95.     In their current forms, the No-Surcharge Rules may be found at, for example, Visa Product and Service Rules 5.6.1 and Mastercard Rules 5.11.1 and 5.11.2 (U.S. Region).

96.     Defendants also imposed "No-Discount Rules" starting at their inception. Under the No Discount Rules in their original forms, Merchants were allowed only to offer discounts to customers who paid in cash, rather than using a Payment Card. Giving discounts for cash did not allow Merchants to counteract the Defendants' market power because cash was not a reasonable substitute for Payment Cards. Moreover, discounting for cash did not allow Merchants to play networks or Issuers against each other to secure the most favorable costs and acceptance terms.

97.     Pursuant to the DOJ Consent Decree, Visa and Mastercard changed their rules on July 20, 2011 to allow Merchants to offer discounts to cardholders for using a particular card brand or product. While the DOJ Consent Decree improved competition, Merchants still are prohibited from offering discounts to cardholders for using the cards issued by particular Issuing Banks or, where such ability exists, have been deterred from doing so by the Anti-Steering Restraints. The

current versions of the No-Discount Rules may be found at Visa Core Rule 1.5.4.14 (US Region and Territories) and Mastercard Rule 5.11.1 (U.S. Region).

98.    But for the No-Discount Rules, Merchants, like Verizon, could use Issuer-specific discounts to secure more favorable acceptance costs and terms than are currently available. Even those Merchants that could not offer discounts or chose not to do so would benefit by the additional competition of Issuers competing for Merchants' business.

99.    The Anti-Discrimination Rules prohibit Merchants, like Verizon, from obtaining better pricing by taking actions that might favor the use of one type or category of credit card or debit card, or one Issuing Bank's card, over another Credit Card or Debit Card. The Discrimination Rules were modified as required by the DOJ Consent Decree in 2011. Although the DOJ Consent Decree improved competition, the remaining Visa and Mastercard Discrimination Rules harm cardholders by precluding them from receiving the benefit of Merchant strategies that reward cardholders for using a lower-cost form of payment. Some of these strategies may include indicating a preference for certain Issuers' cards, in exchange for reduced Interchange Fees. The Discrimination Rules in their current form may be found at Visa Core Rule 1.5.4 and Mastercard Rule 5.11.1 (U.S. Region) and in Visa and Mastercard's and Member Banks' interpretation of those rules.

100.    The "No-Multi-Issuer Rules" prohibit the use of competitive marks on Visa-branded or Mastercard-branded Payment Cards. These rules prevent the issuance of Payment Cards through which a Merchant might reduce its cost of acceptance by routing a transaction to the network with the lowest cost of acceptance. Visa and Mastercard revised their rules to allow multiple PIN-Debit marks on cards to comply with the Durbin Amendment and its implementing

regulations. The No-Multi-Issuer Rules deprive Merchants of a tool that they could use to route transactions over lower-cost networks or incent cardholders to choose lower-cost networks.

101.    Visa's "No-Bypass Rule" prohibits Issuers and Acquirers from bypassing the VisaNet system when processing transactions on Visa-branded cards. This rule prevents an Issuing Bank and an Acquiring Bank from competing for Merchant acceptance by directly routing transactions between the two banks and bypassing the VisaNet system. In combination with other Anti-Steering Restraints, this rule prevents Merchants from seeking to lower their costs of acceptance by steering customers to use Payment Cards in which the Issuer and Acquirer are the same or have entered into an agreement to route transactions directly between the Banks, without using the VisaNet system.

102.    The Default Interchange Rules, the Honor-All-Cards Rules, and the Anti-Steering Restraints (including the No-Surcharge Rule, the No-Discount Rule, and the Miscellaneous Exclusionary Restraints described above) are reflected in the Rules and Merchant Agreements of Visa, Mastercard, and their Member Banks. Visa's Core Rule 1.5.2.1 and Mastercard Rule 5.1.2 ("Required Merchant Agreement Terms") mandate that Acquirers' Merchant Agreements require Merchants to abide by the Visa and Mastercard's respective operating regulations, which include the Anti-Steering Restraints.

103.    The Acquiring Banks in fact incorporate the Default Interchange Rules, the Anti-Steering Restraints, and the Honor-All-Cards rules into their agreements with Verizon and other Merchants.

104.    These anti-competitive restrictions enable Visa and Mastercard to maintain market power. While potential new entrants and competitors such as Discover stand ready, willing, and able to compete with the Defendants by offering lower fees charged to Merchants, the Defendants'

rules prevent and restrain any such competition by ensuring that increased efficiency and lower prices will not lead to increased sales for competitors.

105.    But for Defendants' conduct, the emergence of mobile payments would threaten to inject competition into the market to Verizon's benefit. In contrast to in decades past when a consumer needed to carry a separate, plastic Payment Card for each Payment Form she possessed, multiple Payment Forms may be accessible on one device such as a mobile phone, which—absent interference from Defendants—would greatly ease Verizon's ability to steer transactions to the most cost-effective Payment Form.

106.    There is no procompetitive justification for the Anti-Steering Restraints. These rules were naked restraints on trade, were not ancillary to the legitimate and competitive purposes of the Visa and Mastercard, and have had profound anticompetitive effects.

107.    The Anti-Steering Restraints are not necessary to "balance" the "two sides" of the alternative relevant markets for Credit-Card-Network Services to Merchants and cardholders or Debit-Card-Network Services to Merchants and cardholders.

108.    While the rules changes brought about as a result of the settlement, the DOJ Consent Decree, and the Durbin Amendment were steps in the right direction, Verizon continues to suffer injury as a result of the enforcement of the current Anti-Steering Restraints and as a result of the continuing effects of decades of enforcement of the No-Surcharge Rule and the prior versions of the restraints.

### G.    The Effect of Visa and Mastercard's Restructurings.

109.    Visa and Mastercard both restructured to avoid antitrust scrutiny.

110.    The restructurings adopted by Mastercard and Visa are akin to the members of a cartel who, having been caught fixing prices in violation of the Sherman Act, spin-off their

competing businesses to a new "single entity," with the explicit understanding and with structural guarantees that the new "single entity" will continue to fix prices at the supracompetitive levels previously set by the cartel's members.

111. Because the "single entity" Mastercard and Visa have market power, they can unilaterally impose uniform schedules of default Interchange Fees on Merchants, maintain those Interchange Fees at supracompetitive levels, and impose Anti-Steering Restraints on the Merchants. This is demonstrated by the fact that Mastercard and Visa have increased Interchange Fees several times since their IPOs, and continue to enforce their restrictive rules, without losing significant Merchant acceptance.

112. But for the unlawful conduct alleged herein, Visa, Mastercard and their Member Banks could not impose uniform levels of default Interchange Fees on Merchants, raise and maintain those Interchange Fees at supracompetitive levels, or impose the Anti-Steering Restraints on the Merchants.

113. Visa and Mastercard have argued that by reconstituting their Boards of Directors to include a majority of directors "independent" of the Member Banks, and changing the ownership and governance rights of the Member Banks, the "new" networks are single entities whose post-IPO setting of Interchange Fees and imposing of the Anti-Steering Restraints is outside the scope of Section 1 of the Sherman Act.

114. As both Mastercard and Visa acknowledged before their IPOs, Interchange Fees were doomed to disappear or drastically decrease. The IPOs harmed competition by allowing Mastercard and Visa to perpetuate their anticompetitive Interchange Fees.

115. In April 2012, Visa implemented a fixed fee known as the Fixed Acquirer Network Fee ("FANF"). If a Merchant accepts any Visa Payment-Card transactions, Credit or Debit, the

Merchant must pay a fixed fee to "access" Visa's networks, which increases with the number of locations that the Merchant operates. The imposition of the FANF represents a significant, unilateral price increase by Visa without any commensurate benefit to Merchants or cardholders. The ability of Visa to impose such fees further demonstrates that its IPO significantly lessened competition.

116.    Since the restructurings, no Defendant or Member Bank has taken any affirmative steps to withdraw from any of the Mastercard or Visa conspiracies described in this complaint. The Defendants and Member Banks continue to benefit—to the tune of tens of billions of dollars per year—from the supracompetitive Interchange Fees and other practices described in this complaint. Each Member Bank knows and understands that, even after the restructuring, it will continue to receive supracompetitive Interchange Fees at the default rates, absent a bilateral agreement (which are disincentivized by the Anti-Steering Restraints).

**H.      Legislative and regulatory reforms sought to inject needed competition into the Payment-Card marketplace.**

117.    In 2009, the Antitrust Division of the Department of Justice opened an investigation into the anticompetitive practices of Visa, Mastercard, and American Express. DOJ concluded that "Defendants' Merchant Restraints suppress price and non-price competition by prohibiting a merchant from offering discounts or other benefits to customers for the use of a particular General Purpose Card. These prohibitions allow Defendants to maintain high prices for network services with confidence that no competitor will take away significant transaction volume through competition in the form of merchant discounts or benefits to customers to use lower cost payment options." Competitive Impact Stmt. at 9, *United States et al. v. Am. Express Co.*, No. 1:10-cv-04496-NGG-CLP (Oct. 4, 2010).

118.     DOJ then entered into a consent decree with Visa and Mastercard, in which Visa and Mastercard agreed to repeal their No-Discounting Rules, rules that prevented Merchants from promoting or expressing a preference for a particular brand of card, and rules that prevented Merchants from informing their customers of the cost of accepting various cards. *Id.* at 10-11.

119.     In response to the public comments submitted during the consent-decree-approval process, the DOJ clarified that the consent decree would require Visa and Mastercard to allow Merchants to post two (or more) separate prices for a bundle of goods at the POS, without specifying whether the separate prices were the result of a discount or a surcharge. Pl. Resp. to Public Cmts. at 26, *United States v. Am. Express Co.* (Jun. 14, 2011).

120.     In July, 2010, President Obama signed the Dodd-Frank Act into law. Included in Dodd-Frank was the "Durbin Amendment", which required the Federal Reserve to issue rules limiting the banks' practice of issuing debit cards that were compatible with only the issuer's networks. Dodd-Frank Wall Street Reform and Consumer Protection Act, §1075, Pub. L. No. 111-203 (July 21, 2010). In response, the Federal Reserve issued Regulation II, which required issuers to enable their debit cards to route transactions through a minimum of two unaffiliated networks. 12 CFR 235.7(a). Regulation II also prohibited issuing banks from directly or indirectly inhibiting merchants from choosing to process card payments over any available network. *Id.* at (b) ("An issuer or payment card network shall not, directly . . . or otherwise, inhibit the ability of any person that accepts or honors debit cards for payments to direct the routing of electronic debit transactions for processing over any payment card network that may process such transactions.").

121.     The Durbin Amendment also allowed Merchants to place minimum-purchase amounts of up to $10 on Credit-Card transactions.

122.    Regulation II did not require that a card be compatible with both unaffiliated PIN and unaffiliated signature networks. An issuing bank could comply with the rules by enabling two unaffiliated PIN networks, and still routing all signature-authenticated transactions through a single, affiliated network. *See, e.g.*, Compliance Guide to Small Entities, Board of Governors of the Federal Reserve System https://www.federalreserve.gov/bankinforeg/regiicg.htm. Visa and Mastercard arranged for issuing banks to issue debit cards compatible with multiple unaffiliated PIN networks, but which still routed all signature transactions through the Visa or Mastercard signature network.

123.    The Durbin Amendment was intended to lower Merchants' costs of accepting Payment Cards and also to provide some competition at the POS, such that Debit-Card networks would have an incentive to lower their Interchange Fees in order to incent Merchants to route Debit-Card transactions over their networks.

**I.      Defendants engaged in additional anticompetitive conduct to thwart industry reforms intended to benefit competition.**

**1.      Defendants belatedly pushed the adoption of Chip-and-PIN technology.**

124.    Starting in the 1990s, technology was adopted outside of the United States that enabled the verification of a Payment-Card transaction through the use of a microchip embedded in the card that interacts with the POS terminal in place of the magnetic stripe. This "EMV chip" is named for the three companies that originally created it: EuroCard, Mastercard, and Visa. EMV chips must all meet certain technical standards established by EMVCo, LLC, an entity controlled by six members, which include Visa and Mastercard. EMVCo establishes technical standards for EMV chips and the terminals that interact with them.

125.    EMV was originally developed in the early 1990s to replace the 1970s-era magnetic stripe technology that made cards vulnerable to duplication through rudimentary and widely

available methods. Unlike magnetic stripes, which contain a single unique identifier that remains constant throughout the life of the card, EMV chips transmit a new unique identifier every time a card is used. As a result, even if this identifier is intercepted at the POS, it cannot be used to process additional transactions.

126.    EMV chips connect to payment networks through an application identifier ("AID"), which is a piece of software that detects available payment networks and routes transactions through them. Unlike the static network data on a magnetic stripe, the data in an AID is dynamic. EMV chips can be programmed with multiple AIDs, which themselves can be linked to different networks. For instance, EMV chips can contain one AID linked only to a single network, and another AID linked to multiple networks. Which networks are available to route the transaction depends on the AID selected at the POS. In practice, most EMV chips contain a Global AID and a Common AID. Despite its name, the Global AID connects to only the payment networks owned by Visa or Mastercard. The Common AID connects to all payment networks that pay a licensing fee to EMVCo, including Visa and Mastercard, along with other smaller payment networks.

127.    While EMV technology was introduced in Europe and elsewhere shortly after its development in the 1990s, cards issued in the United States continued to use magnetic stripe technology. Defendants claimed this was because card payments had not been as widely adopted in Europe as in the United States. Because most Merchants in the United States had already invested in POS technology designed around the magnetic stripe, upgrading cards to EMV would require costly, cumbersome, and piecemeal upgrades. In Europe, by contrast, EMV technology could more easily be adopted whole-cloth. Visa purportedly resisted implementing EMV technology in the United States because of what it characterized as the "massive resource and

requirements to force deployment of chip," and as e-commerce matured Visa added the criticism that EMV "does not address Card Not Present fraud, the largest type of fraud in the U.S."

128.    Visa and Mastercard were also reluctant to introduce EMV technology in the United States because doing so would risk steering debit transactions away from their proprietary signature networks. Outside of the United States, EMV is paired with PIN authentication, which offers additional protection against card fraud and theft. This "Chip-and-PIN" combination is widely considered to be the most secure form of authentication. The chip prevents duplication and PIN authentication ensures that even if a card is physically stolen it cannot be used without its PIN.

129.    A consequence of this arrangement, however, is that essentially all debit transactions are routed through PIN-Debit networks, instead of through Visa and Mastercard's proprietary, higher-fee Signature Debit networks. Visa and Mastercard delayed the U.S. rollout of EMV technology in order to preserve their dominance in signature networks in the United States.

130.    After the Durbin Amendment prevented the issuing of Debit Cards linked to only proprietary networks, however, Visa and Mastercard both began a rollout of EMV technology in the United States even though, by this time, other technologies had developed that were more effective than the EMV chip in preventing fraud.

131.    In 2011, Visa announced that it would begin implementing EMV technology in newly-issued cards, and that Merchants would need to update their POS terminals to accommodate the new technology by October 2015. Mastercard followed suit with a similar rule early in 2012. While new cards would continue to have magnetic stripes, and would therefore remain compatible with older POS terminals, Visa and Mastercard incentivized Merchants to upgrade their point of sale terminals by shifting liability for card theft: if a customer transacted a purchase using magnetic

stripe with a card that was EMV-capable, and the magnetic stripe information was stolen and used fraudulently, the Merchant—not the bank—would be responsible for any resulting monetary loss.

132.    Defendants rolled out the technology to allow for the choice mandated by Regulation II in a manner that thwarted competition.

133.    First, even after the liability shift, Visa and Mastercard continued to promote signature authentication of debit transactions, in order to prioritize their signature networks. The liability shift applied to debit transactions authenticated by both PIN and signature, even though signature authentication accounts for the vast majority of debit card fraud.

134.    In the United States, both Visa and Mastercard continued to require merchants to allow customers to use either PIN or signature authentication. Despite widespread adoption of Chip-and-PIN abroad, Visa and Mastercard took the position that its use in the United States would be infeasible because PINs would be difficult to remember and slow down the authentication process.

135.    The purpose behind maintaining signature authentication was to allow Visa and Mastercard to continue to extract supracompetitive prices by routing transactions through their proprietary signature networks.

136.    Second, Visa's liability shift announcement initiated a scramble in the industry to deploy technology that simultaneously enabled EMV transactions, in compliance with Visa's dictate, and also complied with the Durbin Amendment's requirement that Merchants be able to route Debit-Card transactions.

137.    After Visa's announcement mandating that Merchants adopt EMV technology, technologies emerged that would have enabled Merchants to have competitive routing options on all Debit-Card transactions, regardless of whether those transactions were verified with a PIN,

signature, or had no verification method at all. However, by imposing the liability shift on Merchants, Visa and Mastercard foreclosed any competing technology from emerging.

138.    Third, even Visa and Mastercard took steps to ensure that even debit transactions authenticated via PIN would continue to be routed over their networks. As an example, when a cardholder selects PIN authorization using a new EMV terminal, she was prompted to choose whether to process the transaction over a "Visa Network" or a "US Debit Network." If the cardholder chose "Visa Network," the transaction would be routed over the Global AID, which links only to Visa's (higher fee) PIN network. If the cardholder chose "US Debit Network," the transaction would be routed over the Common AID, which is linked to the two unaffiliated networks that charge a competitive fee. The terminal did not further explain the difference between these two networks, or note the difference in each network's associated fees. Even if it did, this difference would be of little interest to the cardholder, since it is the Merchant that directly incurs the transaction fee. By delegating this choice to the cardholder, who is not impacted by the choice at all but is much more likely to pick the option labeled "Visa", the EMV terminals robbed the Merchants of the ability to route a PIN transaction over competitive networks, undermining the purpose of Regulation II.

139.    While Visa claims that this change increased the freedom of choice of the cardholders, this change did no such thing. Rather, it shifted the choice away from a sophisticated stakeholder (the Merchant) and gave it to a party with no stake in or understanding of the choice at all. Delegating the choice to the cardholder served only to eliminate price competition, without providing any additional benefit to cardholders, and effectively raising prices for all consumers.

140.    In November, 2016, the FTC launched an investigation into Visa's practice of requiring Merchants to allow customers to choose which AID to route PIN-debit transactions

through. The purpose of the investigation was to address concerns that these customer selection requirements inhibited the merchant routing choice guaranteed by the Durbin Amendment." On November 22, 2016, the FTC announced that it closed its investigation in light of Visa revising its rules to allow Merchants to route PIN-debit transactions through the network of their choice.

141.    The behavior described above demonstrates how, even after the EMV roll-out, Defendants continued to restrict competition in contravention of the Dodd-Frank Act.

## 2.    Defendants begin to restrain competition in the mobile-payments sector.

142.    Visa's anticompetitive actions have not been limited to plastic Payment Cards. To the contrary, Visa has extended the abuse of its monopoly position to the rapidly-emerging mobile-payments space.

143.    For example, Visa will not allow Merchants to route Debit-Card transactions to competing networks for "in-app" transactions (i.e., transactions that a consumer initiates from a mobile-payments application such as Amazon or eBay). "In-app" purchases account for the majority of mobile-payment transactions.

144.    Visa has also taken steps to cement its monopoly over Debit transactions conducted with a mobile device. As part of the EMV push, many Merchants now have the capability to accept mobile payments. If a Merchant has the proper terminal—as do most Merchants with EMV-capable terminals—it can accept a payment from a consumer who pays using a mobile device that interacts with the terminal's Near Field Communication ("NFC") technology. *See Visa Announces Plans to Accelerate Chip Migration and Adoption of Mobile Payments*, Visa (Aug. 9, 2011), *available at* https://usa.visa.com/about-visa/newsroom/press- releases.releaseId.1594598.html.

145.    Mobile payments are made through a "digital wallet" that runs on mobile devices such as smartphones and tablets. The most well-known early versions of digital wallets emerged

in 2011 with the release of Google Wallet. Apple's digital wallet platform, Apple Pay, followed in 2014. In 2015, both Android Pay and Samsung Pay were released. Other versions, including Microsoft Wallet, have been released more recently, with more expected in 2017 and beyond. Multiple digital wallets can be downloaded onto a single device at minimal cost or inconvenience to the user, so mobile transactions have the potential to become highly dynamic and competitive.

146.    But competition that would inure to the benefit of Merchants and consumers is not favored by Defendants because it comes at the expense of their supracompetitive profits. Visa and Mastercard adopted and implemented EMV—and with it, NFC—technology with an eye toward using their market power to ensure their continued dominance even as mobile payment overtook traditional card payment. By requiring Merchants to install new EMV terminals already equipped with NFC technology, Visa and Mastercard substantially increased the odds that their proprietary NFC technology would become entrenched as the dominant method of accepting mobile payments.

147.    As an example of inhibiting competition in mobile payments, Visa requires that, for all Debit Card transactions in which the consumer selects a Visa Debit Card, that transaction is routed over Visa's network, even though, according to the Durbin Amendment, it should provide the Merchant with the option of routing the transaction over a competitive network.

148.    Visa has admitted that it does not allow Merchant routing on payments made through Google Wallet, available on Android devices. In August 2012, Visa stated that it "understand[s] that merchants/acquirers are unable (and will continue to be with this proposal) to make routing choices on Debit cards which are required to support at least one non-affiliated network."

149.    Visa and Mastercard have also construed and applied their Honor All Cards rules to become "Honor All Devices" rules. Specifically, Visa and Mastercard rules require Merchants

to accept all devices set up to transact through a Visa or Mastercard network to the extent the Merchant accepts payments using communications technology employed by the device. This results in a Merchant having limited ability to refuse or condition acceptance of payments from digital wallets.

150.    Merchants are thus restrained in their ability to refuse or condition payments from digital wallets because the Honor All Devices rules require Merchants to accept all network-branded payments from any device that uses a communications technology accepted by the Merchant. If a Merchant accepts payment through one kind of digital wallet affiliated with Visa or Mastercard, it must accept payments through all digital wallets associated with Visa or Mastercard.

151.    For example, Visa refuses to permit routing to competitive network for payments made with Apple's Apple Pay solution. According to various public sources, Visa has secured Apple's adherence to this scheme by paying it fifteen basis points (i.e., 0.15%) on all Debit-Card transactions initiated with Apple Pay at the POS. See, e.g., Olga Kharif, Banks Are Ceding Ground to Apple Pay, Bloomberg Businessweek (Feb. 18, 2016, 2:08 pm), www.bloomberg.com/news/articles/2016-02-18/banks-are-ceding-ground-to-apple-pay.

152.    Visa's anticompetitive scheme in the mobile-payments space has prevented firms that offer digital wallets from leveraging ACH networks (which link to all U.S. bank accounts and clear without Interchange Fees) to give Merchants a cost-effective alternative to mobile payments.

153.    Under the Honor All Devices rules, Merchants cannot choose to honor only digital wallets that route through low-fee networks, or that offer more security. The rules inhibit market competition by removing the decision-making ability from the party that actually pays the fees on any transaction. Instead, the rules force the Merchant to accept any Visa or Mastercard product from any digital wallet that a customer presents for payment.

**J.      Defendants' unlawful conduct harms competition.**

154.    Defendants' unlawful conduct harms competition, with resulting adverse output effects, in myriad ways. Among other anticompetitive effects, Defendants' unlawful conduct:

    a.   imposes supracompetitive Interchange Fees and other fees on Verizon;

    b.   imposes a supracompetitive total price (considering prices to Verizon and cardholders) on the relevant transactions;

    c.   significantly impairs the ability of low-price or differentiated-quality providers to enter or expand by charging lower Interchange Fees to Verizon;

    d.   significantly impairs the ability of low-price or differentiated-quality providers to enter or expand by charging a lower total price for the transaction;

    e.   significantly impairs the ability of cardholders to react to price signals and thereby internalize the costs of their choice of payment method and select the most efficient payment method;

    f.   prevents competition from producing an efficient price-pair (an efficient price to both Verizon and cardholders);

    g.   incentivizes inefficient spending by Issuing Banks on promoting card-holding and card-usage, as those banks chase a greater share of the supracompetitive profits and try to lock cardholders into non-monetary "rewards";

    h.   substantially interferes with competition within and among networks by preventing the emergence and success of any pricing model or network that does not rely on an upward spiral of greater Interchange Fees imposed on

Verizon and "rewards" to cardholders;

i.  substantially interferes with competition from less costly payment methods,
    by interfering with price signals at the POS and thereby shielding high-cost
    cardholders from the social costs of their choices;

j.  substantially impairs rival debit networks' ability to compete for Verizon
    acceptance; and

k.  transfers wealth from and creates a negative externality to customers who
    use efficient, lower-cost payment methods such as cash, debit, and non-
    premium credit cards.

155.    The unlawful conduct is not necessary—and is more restrictive than necessary—to
attain any procompetitive benefit that Defendants may argue exists.

156.    Verizon's injury accumulates and increases with each passing day that Defendants'
anticompetitive practices are allowed to continue. These injuries will continue to increase during
the pendency of this suit until halted by Court Order.

157.    Through their anticompetitive activities in the mobile-payments sector, Defendants
have foreclosed rival Debit Networks from competing with Visa and Mastercard for Merchant
acceptance and have frustrated one of the central purposes behind the Durbin Amendment and the
DOJ's consent decree with Visa and Mastercard, to the detriment of Merchants, like Verizon, and
Cardholders.

**K.    The Defendants' uniform schedules of Default Interchange Fees and
       Anti-Steering Restraints are not necessary to the functioning of a
       Payment-Card Network.**

158.    The Visa and Mastercard networks could function efficiently without rules
requiring the payment of Interchange Fees on every transaction. Even if the Member Banks of
Visa and Mastercard did not fix and agree to abide by uniform schedules of default Interchange

Fees, the Visa and Mastercard networks could continue in their roles as standard-setting organizations for Payment Card transactions.

159.     The uniform schedules of Interchange Fees and rules requiring the payment thereof are not a core function of the Visa and Mastercard Credit and Signature Debit networks. They are not reasonably necessary to the operation of the Visa and Mastercard networks. Even if some Interchange Fees were reasonably necessary, Defendants' uniform schedules of Interchange Fees are more restrictive of competition than is necessary to effectuate the business of Visa and Mastercard.

160.     Unlike the early days of Visa and Mastercard when Interchange Fees were purportedly based on certain issuer costs, Visa and Mastercard now set their Interchange Fees based on their perceptions of Merchants' elasticity of demand. This permits Visa and Mastercard and their Member Banks to identify and impose on each category of Merchants an Interchange Fee that approximates the "reservation price" of Merchants in that category. This is the pricing strategy typically associated with firms that possess substantial market power.

## IX.     RELEVANT MARKETS

### A.     General-Purpose-Card Network Services

161.     A relevant market exists, the product dimension of which is no broader than General-Purpose Cards. *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *3 (E.D.N.Y. Apr. 1, 2003); *United States v. Visa*, 163 F. Supp. 2d 322, 335 (S.D.N.Y. 2001). The geographic dimension of this market is the United States ("General-Purpose-Card Market"). *United States v. Visa*, 163 F. Supp. 2d at 339-40 (S.D.N.Y. 2001), *aff'd*, 344 F.3d at 239 (2d Cir. 2003).

162.    A separate relevant market exists, the product dimension of which is no broader than General-Purpose-Card Network Services. *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *3 (E.D.N.Y. Apr. 1, 2003); *United States v. Visa*, 163 Supp. 2d at 338, aff'd, 344 F.3d at 239. General-Purpose-Card Network Services consists of the acceptance of General-Purpose Cards by Merchants as payment for goods and services. The geographic dimension of this market is the United States ("General-Purpose-Card-Network-Services Market").

163.    There may also be narrower Relevant Markets, such as a market for the acceptance of Visa-branded or Mastercard-branded Credit-Card transactions.

164.    The relevant-market inquiry in this case "is not the same as" that in *United States v. Am. Express Co.*, 838 F.3d 179, 198 (2d Cir. 2016). Unlike American Express, which is a "three-party" network that the Second Circuit opined to be a "single firm operating within the broader 'network services' industry at issue in [*United States v.*] *Visa*," Visa and Mastercard's restraints were adopted by "20,000 competitors."

165.    A hypothetical monopolist in the market for General-Purpose-Card Network Services could impose a small but significant and non-transitory increase in price of at least five percent without losing significant Verizon and other Merchant acceptance.

166.    Both Visa and Mastercard, "together with their Member Banks," jointly and separately, have market power in the markets for General-Purpose Cards and General-Purpose-Card Network Services. *United States v. Visa*, 163 F. Supp. 2d at 340, *aff'd*, 344 F.3d at 239.

167.    The market shares of Visa and Mastercard indicate that each has market power in the General-Purpose-Card-Network-Services market. In 1999, Visa had a 47% share of the General-Purpose-Card transactions by dollar volume in the United States, while Mastercard's

share was 26%. Visa and Mastercard had a combined market share of 73%. *United States v. Visa*, 163 F. Supp. 2d at 341. At that time, Visa and Mastercard collectively issued 85% of the General-Purpose Cards in the United States. *Id.*

168. The Defendants' market shares underestimate their market power because the Anti-Steering Restraints convert Merchants' acceptance decisions into an all-or-nothing proposition where Merchants that have decided to accept one of the Networks' Payment Cards must accept all of that Networks' cards without regard to the costs of that Payment Card. Thus, unlike in other markets, the consumers of Network Services (Merchants like Verizon) cannot accept more or less of a particular Payment-Card product depending on the price of that product.

169. Concerted activity between Visa and Mastercard allows the Networks to collectively assert market power. *See In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *3 (E.D.N.Y. Apr. 1, 2003) (noting evidence of collusion between Visa and Mastercard with respect to their Debit Card strategies).

170. Verizon does not view Debit-Card Network Services and General-Purpose-Card Network Services as interchangeable. This is evidenced by the fact that Verizon continues to accept Visa and Mastercard Credit Cards even though the Interchange Fees associated with Credit Card transactions are significantly higher than the fees associated with Debit-Card transactions.

171. Throughout the relevant time period, Visa and Mastercard have increased Interchange Fees by large amounts, and introduced new premium Credit Cards with much higher Interchange Fees, without losing Verizon's acceptance as a result.

172.    None of the increases in Visa and Mastercard's Credit-Card Interchange Fees during the relevant time period have been attributable to increases in the level of costs associated with the operations of the Networks.

173.    The demand for General-Purpose-Card-Network Services is unresponsive to the prices of other, facially similar products. For example, when the Durbin Amendment's caps on Debit-Card Interchange Fees went into force, Visa and Mastercard did not lower General-Purpose-Card Interchange Fees in response, indicating that the Networks did not fear that Verizon or other Merchants would refuse to accept or steer customers away from General-Purpose Cards in favor of Debit Cards.

174.    Visa and Mastercard have exercised their market power in the General-Purpose-Card-Network-Services market. As the court noted in the United States' action against the Networks, Visa and Mastercard raised Credit-Card Interchange Fees charged to Merchants a number of times without losing Merchants. *United States v. Visa*, 163 F. Supp. 2d at 340. Visa and Mastercard continue their practice of increasing Interchange Fees, again without losing Verizon's acceptance.

175.    Visa and Mastercard have also forced Verizon to accept Premium Credit Cards, which carry higher Interchange Fees than non-premium cards. Verizon might refuse to accept them or steer customers away if it had the power to do so. Visa and Mastercard rules require Merchants that accept Visa and Mastercard Credit Cards to also accept these "Premium Cards," and prevented or limited Verizon's ability to steer customers of less expensive forms of payment to less expensive forms of payment. Verizon's inability to resist the imposition of higher Interchange Fee cards further demonstrates Visa and Mastercard's market power.

176.     There are significant barriers to entry in the General-Purpose-Card-Network-Services Market. Because of these barriers, the only successful market entrant since the 1960's has been Discover, which was introduced by Sears and benefited from its then extensive network of stores, its extensive base of customers who carried Sears' store card, and its relationship with financial services from Dean Witter.

177.     New entry into the General-Purpose-Card-Network-Services Market would cost more than $1 billion and would involve a "chicken-and-egg problem of simultaneously developing a large Merchant acceptance network as well as a network of millions of cardholders who, in turn, are needed to induce Merchants to accept the system's cards in the first place." *United States v. Visa*, 163 F. Supp. 2d at 342.

178.     Barriers to entry are so great that would-be entrants, such as Apple or Android, find it in their interest to take a share of Defendants' supracompetitive profits rather than to launch competing solutions.

179.     Visa and Mastercard's substantial (individual and collective) market power in the General-Purpose-Card and Debit-Card Network-Services Markets has been reinforced by their implementation and enforcement of the Anti-Steering Restraints and Miscellaneous Exclusionary Restraints, which insulate them from competition that would exist in a free market.

180.     The evidence at trial may establish that the markets relevant for the provision of Network Services are narrower "single brand" markets, i.e. a market for the processing of Visa Payment-Card transactions, and a market for the processing of Mastercard Payment-Card transactions. Or, the evidence at trial may establish other Relevant Markets affected by Defendants' conduct.

### B. Debit-Card Network Services

181.    A separate relevant market exists, the product dimension of which is no broader than Debit Cards. *See In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *2 (E.D.N.Y. Apr. 1, 2003). The geographic dimension of this market is the United States.

182.    A relevant market exists, the product dimension of which is no broader than Debit-Card Network Services. See In re Visa Check/MasterMoney Antitrust Litig., 2003 WL 1712568, at *7 (E.D.N.Y. Apr. 1, 2003). Debit-Card Network Services consists of the acceptance of Debit Cards by Merchants as payment for goods and services.

183.    There may also be narrower markets for Signature-Debit-Card Network Services and PIN-Debit-Card Network. The geographic dimension of these markets is the United States.

184.    The relevant-market inquiry in this case "is not the same as" that in *United States v. Am. Express Co.*, 838 F.3d 179, 198 (2d Cir. 2016). Unlike American Express, which is a "three-party" network that the Second Circuit opined to be a "single firm operating within the broader 'network services' industry at issue in [*United States v.*] *Visa*," Visa and Mastercard's restraints were adopted by "20,000 competitors." *Id.*

185.    Debit Cards and Debit-Card Network Services are unique bundles of services. Consumers who use Debit Cards either want to or have to make contemporaneous payment for their purchases with funds in their depository accounts. These consumers either choose not to borrow money for those purchases or cannot do so (because they may not be deemed credit-worthy by Credit Card Issuing Banks).

186.    Other payment products are not reasonable substitutes for Debit Cards and Debit-Card Network Services. Visa and Mastercard do not consider other products such as

Credit Cards, checks, and cash when setting Debit-Card Interchange Fees. For example, cash cannot be used for online purchases.

187.    Before the Durbin Amendment capped Debit-Card Interchange Fees for most transactions, Debit-Card Interchange Fees were increasing, unconstrained by any other form of payment. If the Interchange-Fee caps under the Durbin Amendment were repealed, a hypothetical monopolist in the market for Debit-Card Network Services could impose a small but significant and non-transitory increase in price of at least five percent.

188.    As detailed above, Visa completed a decades-long strategy to "converge" PIN-Debit and Offline-Debit Interchange Fees in 2010. Until that time, submarkets within the markets for Debit Cards and Debit-Card-Network Services, existed for respectively PIN-Debit Cards and Signature Debit Cards, and for PIN-Debit-Card-Network Services and Offline-Debit-Card Network Services. These submarkets continued beyond 2010 and may continue even to this day.

189.    Because Signature Debit Cards uniquely enabled consumers to make certain types of purchases, the acceptance of Signature Debit Cards was also unique from a Merchant's perspective. Therefore no other services existed that were reasonably substitutable for Offline-Debit-Card-Network Services.

190.    PIN-Debit transactions require a PIN pad and are not processed by a paper receipt. This means that a greater upfront cost existed to the Merchant for accepting PIN transactions, and in some situations, the use of a PIN-Debit Card required a change in business procedures. For example, in a restaurant, if customers did not pay at a central location, the server would have to bring a wireless PIN pad to the table. These practices are common in Canada and other countries in which Zero-Interchange-Fee PIN-Debit Card networks are well-

established, but, at least as of the time that Visa's "Convergence" strategy was completed, were not common in the United States.

191.     Visa and Mastercard have market power in the market for Debit-Card- Network Services. Further, any estimates of market shares underestimate Defendants' market power because the Anti-Steering Restraints convert Merchants' acceptance decisions into an all-or-nothing proposition where Merchants that have decided to accept one of the Networks' Payment Cards must accept all of that Networks' cards without regard to the costs of that Payment Card. Thus, unlike in other markets, the consumers of Network Services (Merchants like Verizon) cannot accept more or less of a particular Payment-Card product depending on the price of that product.

192.     Concerted activity between Visa and Mastercard allows the Networks to collectively assert market power. *See In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *3 (E.D.N.Y. Apr. 1, 2003) (noting evidence of collusion between Visa and Mastercard with respect to their Debit Card strategies).

193.     The experience after the settlement in *In re Visa Check and MasterMoney Antitrust Litigation* illustrates that Debit-Card-Network Services is a separate Relevant Market from General-Purpose Card Network Services and that Defendants have market power in that market. As a result of that settlement, Visa and Mastercard modified their Honor-All-Cards Rules to allow Merchants to accept only Debit Cards or only Credit Cards, if they so choose. Despite Merchants' somewhat greater freedom to make their own acceptance decisions, few Merchants chose to drop acceptance of Visa and Mastercard Debit Cards, despite the fact that those cards were significantly more expensive than those of other Debit-Card Networks. Also, few Merchants that had not accepted Visa or Mastercard Payment Cards chose to begin

accepting Visa or Mastercard Debit Cards without also accepting Visa or Mastercard Credit Cards.

194.    When they existed, Visa and Mastercard had market power in the submarkets for Signature Debit Cards and Offline-Debit-Card-Network Services and Visa had market power in the submarkets for PIN-Debit Cards and PIN-Debit-Card- Network Services.

195.    By adopting and enforcing the Anti-Steering Restraints, and thwarting the procompetitive reforms of the Durbin Amendment and the DOJ consent decree, Visa and Mastercard have successfully excluded competition in the Relevant Market.

196.    The Relevant Markets described in this section are characterized by high barriers to entry. Despite technological advances in data processing and mobile computing that have enabled entrants to "disrupt" established players in many industries, no meaningful entry has occurred in the Debit-Card or Debit-Card-Network Services Relevant Markets. Moreover, new entrance into these markets would be costly and would involve the "chicken-and-egg" problem of signing up both Card-Issuing banks and Merchants for the network. Visa has entered into exclusive business arrangements with many Member Banks which are designed to further raise entry barriers.

   C.    **General-Purpose-Card Network Services to Merchants and Cardholders**

197.    In the alternative, the evidence may establish that there is a Relevant Market for General-Purpose-Card-Network Services to Merchants and Cardholders. The geographic dimension of this market is the United States.

198.    If proven, alternative Relevant Market for General-Purpose-Card-Network Services to Merchants and Cardholders consists of the Authorization, clearing, and Settlement

services to Merchants, like Verizon, on one hand, and also to Issuing Banks and Cardholders on the other.

199. Other services do not compete with General-Purpose-Card-Network Services to Merchants and Cardholders. Some consumers prefer Credit Cards because they do not have the funds available in their demand deposit accounts to purchase particular items and thus rely on the credit facility that Credit Cards supply. Verizon understands that it will lose sales from these credit-dependent Cardholders if it does not accept Credit Cards.

200. As a result of Defendants' anticompetitive practices, the price of General-Purpose-Card Network Services to Merchants and Consumers is higher than it would be in a competitive market. Credit-Card Issuers do not completely pass through the cost of supracompetitive Interchange Fees to Cardholders. Thus, a significant portion of the Interchange Fees that Defendants impose on Merchants are transferred to Issuers in the form of supracompetitive profits.

201. Throughout the Relevant Time period, the price of General-Purpose-Card Network Services to Merchants and Cardholders has increased significantly, without the Defendants losing significant transaction volume.

202. More recently, when the Durbin Amendment's caps on Debit-Card Interchange Fees entered into force, Visa and Mastercard did not respond by lowering the price of General-Purpose-Card-Network Services to Merchants and Cardholders, indicating that they did not fear that Merchants and Cardholders would switch to Debit Cards over Credit Cards, even in the face of a significant price differential.

203. Both Visa and Mastercard have market power in the Relevant Market for General-Purpose-Card-Network Services to Merchants and Cardholders. The Networks' rules

that require all General-Purpose Cards of a particular network to be accepted by participating Merchants, together with the requirement that an Interchange Fee be paid, and until recently, prohibitions on Merchant Steering, allowed Defendants to raise Interchange Fees to supracompetitive levels, without losing acceptance to other networks or forms of payment. Nor did Cardholders switch to competing networks or forms of payment in a degree sufficient to make these price increases unprofitable, even though Cardholders received only a fraction of the supracompetitive Interchange Fees indirectly rebated to them.

204.    The Anti-Steering Restraints reinforce Defendants' market power in this market. Absent the Anti-Steering Restraints, a Merchant could send an efficient price signal to the Cardholder in a given transaction, thereby enabling the combination of the two actors—the Merchant and the Cardholder—to choose the payment form that provides the optimal combination of price and benefits to the Merchant and the Cardholder.

205.    History illustrates the extent of Defendants' market power in the market for General-Purpose-Card-Network Services to Merchants and Cardholders. Up to the mid- 1980s, few if any Visa or Mastercard Issuing Banks provided Cardholders with the types of rewards that they now argue justify the existence of these fees. This changed when Discover—then a maverick entrant—offered Cardholders one-percent cashback on purchases. While Visa and Mastercard Issuing Banks responded by offering their own rewards, Issuers still refunded only a fraction of the Interchange Fees they received from issuing Visa and Mastercard Credit Cards.

206.    Similarly, when the United States Court of Appeals for the Second Circuit affirmed that Visa and Mastercard's exclusionary rules violated Section 1 of the Sherman Act, American Express began approaching Issuing Banks to persuade them to issue American Express cards. Visa and Mastercard responded to this development by increasing their own

Interchange Fees significantly to prevent Issuers from defecting to American Express, without regard to the effect on Acquiring Banks or Merchants. While some Issuers provided more lucrative rewards programs to Cardholders after Visa and Mastercard increased Interchange Fees, any increase in rewards provided to Cardholders was far surpassed by the Increase in Interchange Fees borne exclusively by Merchants. Accordingly, even if the rewards provided to Cardholders were considered part of the "price" of General-Purpose-Card Network Services, Defendants have been able to increase that price to supracompetitive levels without losing transaction volume to other networks or Forms of Payment.

207.     The Defendants' Rules also reinforce Defendants' market power in this alternative Relevant Market for General-Purpose-Card-Network Services to Merchants and Cardholders. For example, the "Hold-Up Problem" created by the Honor-All-Cards Rule and reinforced by the Default Interchange Rule has eliminated any incentive for Issuers and Merchants to enter into bilateral acceptance agreements, whereby Issuers could incent Cardholders to patronize Verizon by offering the Cardholder unique rewards or benefits and a reduced cost of acceptance to the Merchant. The Hold-Up Problem and the ensuing disincentive to enter bilateral acceptance agreements, together with the restrictions of the Anti-Steering Restraints, agreements artificially inflates the cost of General-Purpose-Card Network Services to Merchants and Cardholders above what would exist in a competitive market.

###     D.     Debit-Card Network Services to Merchants and Cardholders

208.     In the alternative, there may also be a Relevant Market for Debit-Card-Network Services to Merchants and Cardholders. The geographic dimension of this market is the United States.

209.     If proven, alternative Relevant Market for Debit-Card-Network Services to

Merchants and Cardholders consists of the Authorization, clearing, and Settlement services to Merchants, on one hand, and also to Issuing Banks and Cardholders on the other.

210.     Other services do not compete with Debit-Card-Network Services to Merchants and Cardholders. Visa and Mastercard do not consider other products such as Credit Cards, checks, and cash when setting Debit-Card Interchange Fees. Cash cannot be used for online purchases and only a handful of online Merchants accept check payments. Likewise, consumers who are not creditworthy or who prefer not to incur debt on purchases do not view Credit Cards as adequate substitutes for Debit Cards.

211.     Defendants have market power in the market for Debit-Card-Network Services to Merchants and Cardholders.

212.     Before the Durbin Amendment capped Debit-Card Interchange Fees for most transactions, Debit-Card Interchange Fees were increasing, unconstrained by any other form of payment, even if one considered the portion of those fees that were "refunded" to Cardholders in the form of rewards and other benefits.

213.     If the Interchange-Fee caps under the Durbin Amendment were repealed, a hypothetical monopolist in the market for Debit-Card Network Services to Merchants and Cardholders could impose a small but significant and non-transitory increase in price of at least five percent, even if one considers the portion of those fees that are "refunded" to Cardholders in the form of rewards and other benefits.

214.     The Anti-Steering Restraints reinforce Defendants' market power in this market. Absent the Anti-Steering Restraints, Verizon could send an efficient price signal to the Cardholder in a given transaction, thereby enabling the combination of the two actors—

Verizon and the Cardholder—to choose the payment form that provides the optimal combination of price and benefits to Verizon and the Cardholder.

215.     Defendants' ability to thwart competition by preventing the competitive routing options that should have been available to Verizon as a result of the Durbin Amendment also illustrates their market power in this market.

216.     Until Visa completed its "Convergence" strategy, submarkets within the markets for Debit Cards and Debit-Card-Network Services to Merchants and Cardholders, existed for respectively PIN-Debit Cards and Signature Debit Cards, and for PIN-Debit-Card-Network Services to Merchants and Cardholders and Offline-Debit- Card Network Services to Merchants and Cardholders.

217.     When submarkets existed, Visa and Mastercard had market power in the submarkets for Offline-Debit-Card-Network Services to Merchants and Cardholders while Visa had market power in the submarkets for PIN-Debit-Card-Network Services to Merchants and Cardholders.

218.     As noted above, high barriers to entry exist in the Debit-Card- Network-Services Market, regardless of whether the market is defined to include Cardholders as well as Merchants.

## X.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### AGAINST VISA FOR DAMAGES UNDER SECTION 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1, UNLAWFUL PRICE FIXING OF CREDIT-CARD INTERCHANGE FEES BY VISA AND ITS MEMBER BANKS

219.     Verizon repeats and re-alleges each and every factual allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

220.     The Member Banks of Visa — direct, horizontal competitors of each other —
engaged in unlawful contracts, combinations, and conspiracies among themselves and with
Visa in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of
the Sherman Act, 15 U.S.C. § 1.

221.     Visa and its Member Banks have and exercise market power in the General-
Purpose-Card Relevant Markets.

222.     The unlawful contracts, combinations, and conspiracies consisted of continuing
agreements, understandings, and concerts of action between and among Visa's issuing and
acquiring members and Visa, the substantial terms of which were to illegally fix, raise,
maintain, or stabilize the Credit- Card Interchange Fees that are imposed on Verizon in the
General-Purpose-Card Relevant Markets.

223.     The Visa Board of Directors, which for much of the relevant time period
included representatives from several Member Banks, acted on behalf of the Member Banks to
fix, raise, maintain, or stabilize the Interchange Fees for Visa transactions, in violation of
Section 1 of the Sherman Act, 15 U.S.C. § 1.

224.     All of the Member Banks of Visa have actual knowledge of, and have
knowingly participated in, the conspiracy alleged herein.

225.     The contracts, combinations, and conspiracies alleged herein began before
Visa's 2008 IPO and have continued after that date. Even after Visa's IPO, banks' membership
in Visa is contingent upon those banks agreeing to adhere to the anticompetitive rules and
uniform schedule of Default Interchange Fees described herein.

226.     Even after Visa's IPO, each Member Bank agrees to adhere to Visa's uniform
schedules of Default Interchange Fees and knows, understands, and expects that all other

Member Banks will agree to abide by the same rules and uniform schedule of default Interchange Fees.

227.     The contracts, combinations, conspiracies, and agreements alleged in this First Claim has had, and/or is likely to have, among others, the following anticompetitive effects:

a.  Actual and potential competition in the General-Purpose-Card Relevant Markets was substantially excluded, suppressed, and effectively foreclosed and thus competition has been unreasonably restrained;

b.  Defendants acquired and maintained market power in the General- Purpose-Card Relevant Markets;

c.  Defendants controlled and maintained Interchange Fees imposed on Verizon and elevated Interchange Fees imposed on Verizon above competitive levels in the General-Purpose-Card Relevant Markets;

d.  Verizon was required to pay supracompetitive Credit-Card Interchange Fees for Visa transactions in the General- Purpose-Card Relevant Markets;

e.  Defendants derived direct and substantial economic benefits from the supracompetitive Credit-Card Interchange Fees for Visa transactions in the in the General-Purpose-Card Relevant Markets;

f.  But for the anticompetitive conduct of Visa and its Member Banks, competition among banks would have eliminated or greatly reduced the Interchange Fees for Visa transactions in the General-Purpose-Card Relevant Markets; and

g.  Verizon's specific amount of damages has not yet been determined.

228.     The uniform schedules of Default Interchange Fees are illegal. They are not necessary to accomplish any procompetitive benefits of the Visa Network. Even if some horizontal agreement were necessary to promote the efficiencies of the Visa Network, the uniform schedules of Default Interchange Fees are significantly more restrictive than necessary to bring about those efficiencies. The anticompetitive effects of Visa and its Member Banks' price fixing far outweigh any procompetitive benefits—if any even exist—in the General-Purpose-Card Relevant Markets. The supracompetitive levels of Interchange continue to the present date.

**<u>SECOND CLAIM FOR RELIEF</u>**

**AGAINST MASTERCARD FOR DAMAGES UNDER SECTION 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATIONS OF SHERMAN ACT, § 1, 15 U.S.C. § 1, UNLAWFUL PRICE FIXING OF CREDIT-CARD INTERCHANGE FEES BY MASTERCARD AND ITS MEMBER BANKS**

229.     Verizon repeats and re-alleges each and every factual allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

230.     The Member Banks of Mastercard — direct, horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies among themselves and with Mastercard in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

231.     Mastercard and its Member Banks have and exercise market power in the General-Purpose-Card Relevant Markets.

232.     The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Mastercard's issuing and acquiring members and Mastercard, the substantial terms of which were to illegally fix,

raise, maintain, or stabilize the Credit-Card Interchange Fees that are imposed on Merchants, like Verizon, in the General-Purpose-Card Relevant Markets.

233.    The Mastercard Board of Directors, which for much of the relevant time period included representatives from several Member Banks, acted on behalf of the Member Banks to fix, raise, maintain, or stabilize the Interchange Fees for Mastercard transactions, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

234.    All of the Member Banks of Mastercard have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

235.    The contracts, combinations, and conspiracies alleged herein began before Mastercard's 2006 IPO and have continued after that date. Even after Mastercard's IPO, the banks' membership in Mastercard is contingent upon those banks agreeing to adhere to the anticompetitive Rules and uniform schedule of Default Interchange Fees described herein.

236.    Even after Mastercard's IPO, each Member Bank agrees to adhere to Mastercard's the uniform schedules of Default Interchange Fees and knows, understands, and expects that all other Member Banks will agree to abide by the same rules and uniform schedule of default Interchange Fees.

237.    The contracts, combinations, conspiracies, and agreements alleged in this Second Claim have had, and/or are likely to have, among others, the following anticompetitive effects:

        a.   Actual and potential competition in the General-Purpose-Card Relevant Markets was substantially excluded, suppressed, and effectively foreclosed and thus competition has been unreasonably restrained;

        b.   Defendants acquired and maintained market power in the in the General-

Purpose-Card Relevant Markets;

c.  Defendants controlled and maintained Interchange Fees imposed on Verizon and elevated Interchange Fees imposed on Verizon above competitive levels in the General-Purpose-Card Relevant Markets;

d.  Verizon was required to pay supracompetitive Credit- Card Interchange Fees for Mastercard transactions in the in the General-Purpose-Card Relevant Markets;

e.  Defendants derived direct and substantial economic benefits from the supracompetitive Credit-Card Interchange Fees for Mastercard transactions in the General-Purpose-Card Relevant Markets;

f.  But for the anticompetitive conduct of Mastercard and its Member Banks, competition among banks would have eliminated or greatly reduced the Interchange Fees for Mastercard transactions in the General-Purpose-Card Relevant Markets; and

g.  Verizon's specific amount of damages has not yet been determined.

238.  The uniform schedules of Default Interchange Fees are illegal. They are not necessary to accomplish any procompetitive benefits of the Mastercard Network. Even if some horizontal agreement were necessary to promote the efficiencies of the Mastercard Network, the uniform schedules of Default Interchange Fees are significantly more restrictive than necessary to bring about those efficiencies. The anticompetitive effects of Mastercard and its Member Banks' price fixing far outweigh any procompetitive benefits—if any even exist—in the General-Purpose-Card Relevant Markets. The supracompetitive levels of Interchange

continue to the present date. The supracompetitive levels of Interchange continue to the present date.

## **THIRD CLAIM FOR RELIEF**

### **AGAINST VISA FOR DAMAGES UNDER § 4 OF THE CLAYTON ACT, 15 U.S.C. § 16, FOR VIOLATION OF SHERMAN ACT § 1 UNREASONABLE RESTRAINT OF TRADE BY VISA AND ITS MEMBER BANKS IN IMPOSING AND ENFORCING ANTI-STEERING RESTRAINTS**

239.    Verizon repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

240.    Visa has and exercises market power in the General-Purpose-Card Relevant Markets.

241.    The No-Surcharge Rule and the other Anti-Steering Restraints, imposed upon Verizon by Visa and its Member Banks, represent unlawful contracts in restraint of trade violation of Sherman Act, Section 1.

242.    In addition, the collective adoption and enforcement of the No-Surcharge Rule and the other Anti-Steering Restraints by Visa and its Member Banks constitute contracts, combinations, or conspiracies in unreasonable restraint of trade.

243.    The Anti-Steering Restraints are anticompetitive restraints. Among their anticompetitive effects are the inflationary pressure they exert on consumer goods and services, the compulsion of subsidies running from users of low-cost payment media to users of Defendants' high-cost payment media, the entrenchment of Defendants' market positions, and the insulation of Defendants from any competitive threat from a rival offering cheaper or more efficient Payment-Card services.

244.    There are no procompetitive justifications for the Anti-Steering Restraints.

245.    The contracts, combinations, conspiracies, and agreements have had, and/or are likely to have, among other things, the following anticompetitive effect:

a.   Actual and potential competition in the General-Purpose-Card Relevant Markets was substantially excluded, suppressed, and effectively foreclosed;

b.   Visa acquired and maintained market power in the General- Purpose-Card Relevant Markets;

c.   Defendants controlled and maintained Interchange Fees imposed on Verizon and elevated Interchange Fees imposed on Verizon above competitive levels in the General-Purpose-Card Relevant Markets;

d.   Verizon was required to pay supracompetitive Interchange Fees;

e.   Defendants derived direct and substantial economic benefits from the supracompetitive Credit-Card Interchange Fees in the General-Purpose-Card Relevant Markets;

f.   But for the anticompetitive conduct of Visa and its Member Banks, competition among banks would have eliminated or greatly reduced Credit-Card Interchange Fees in order to gain Verizon's business; and

g.   But for the anticompetitive conduct of Defendants, Verizon would have saved millions of dollars by avoiding or mitigating Defendants' uniform schedules of Default Interchange Fees.

<u>**FOURTH CLAIM FOR RELIEF**</u>

**AGAINST MASTERCARD FOR DAMAGES UNDER § 4 OF THE CLAYTON ACT, 15 U.S.C. § 16, FOR VIOLATION OF SHERMAN ACT § 1 UNREASONABLE RESTRAINT OF TRADE BY MASTERCARD AND ITS MEMBER BANKS IN IMPOSING AND ENFORCING ANTI-STEERING RESTRAINTS**

246.    Verizon repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

247.    Mastercard has and exercises market power in the General-Purpose-Card Relevant Markets.

248.    The No-Surcharge Rule and the other Anti-Steering Restraints, imposed upon Verizon by Mastercard and its Member Banks, represent unlawful contracts in restraint of trade violation of Sherman Act, Section 1.

249.    In addition, the collective adoption and enforcement of the No-Surcharge Rule and the other Anti-Steering Restraints by Mastercard and its Member Banks constitute contracts, combinations, or conspiracies in unreasonable restraint of trade.

250.    The Anti-Steering Restraints are anticompetitive restraints. Among their anticompetitive effects are the inflationary pressure they exert on consumer goods and services, the compulsion of subsidies running from users of low-cost payment media to users of Defendants' high-cost payment media, the entrenchment of Defendants' market positions, and the insulation of Defendants from any competitive threat from a rival offering cheaper or more efficient Payment-Card services.

251.    No procompetitive justifications exist for the Anti-Steering Restraints.

252.    The contracts, combinations, conspiracies, and agreements have had, and/or are likely to have, among other things, the following anticompetitive effects:

       a.    Actual and potential competition in the General-Purpose-Card Relevant

Markets was substantially excluded, suppressed, and effectively foreclosed and thus has been unreasonably restrained;

b. Mastercard acquired and maintained market power in the General-Purpose-Card Relevant Markets;

c. Defendants controlled and maintained Interchange Fees imposed on Verizon and elevated Interchange Fees imposed on Verizon above competitive levels in the General-Purpose-Card Relevant Markets;

d. Verizon was required to pay supracompetitive Interchange Fees;

e. Defendants derived direct and substantial economic benefits from the supracompetitive Credit-Card Interchange Fees in the General-Purpose-Card Relevant Markets;

f. But for the anticompetitive conduct of Mastercard and its Member Banks, competition among banks would have eliminated or greatly reduced the Credit-Card Interchange Fees in order to gain Verizon's business; and

g. But for the anticompetitive conduct of Defendants, Verizon would have saved millions of dollars by avoiding or mitigating Defendants' uniform schedules of Default Interchange Fees.

## FIFTH CLAIM FOR RELIEF

**AGAINST VISA FOR DAMAGES UNDER § 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATIONS OF SHERMAN ACT, § 1, 15 U.S.C. § 1, UNLAWFUL PRICE FIXING OF DEBIT-CARD INTERCHANGE FEES BY VISA AND ITS MEMBER BANKS**

253. Verizon repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

254.    Throughout the relevant period, the Member Banks of Visa — direct horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies among themselves and with Visa in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

255.    The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's issuing and acquiring members and Visa, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Debit- Card Interchange Fees imposed on Merchants, like Verizon, in the Debit-Card Relevant Markets.

256.    Visa and its Member Banks have and exercise market power in the Debit- Card Relevant Markets.

257.    The Visa Board of Directors, which, for much of the relevant time period, included representatives from several Member Banks, acted on behalf of the Member Banks to fix, raise, maintain, or stabilize the Interchange Fees for Visa Debit Card transactions, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

258.    All of the Member Banks of Visa have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

259.    The contracts, combinations, and conspiracies alleged herein began before Visa's 2008 IPO and have continued after that date. Even after Visa's IPO, the banks' membership in Visa is contingent upon those banks agreeing to adhere to the anticompetitive Rules and uniform schedule of Default Interchange Fees described herein.

260.    Even after Visa's IPO, each Member Bank agrees to adhere to Visa's uniform schedules of Default Interchange Fees and knows, understands, and expects that all other

Member Banks will agree to abide by the same rules and uniform schedule of default Interchange Fees.

261.     The contracts, combinations, conspiracies, and agreements alleged in this Claim have had, and/or are likely to have, among others, the following anticompetitive effects:

a.  Actual and potential competition in the Debit-Card Relevant Markets was substantially excluded, suppressed, and effectively foreclosed and thus has been unreasonably restrained;

b.  Defendants acquired and maintained market power in the Debit-Card Relevant Markets;

c.  Defendants controlled and maintained Interchange Fees imposed on Verizon and elevated Interchange Fees imposed on Verizon above competitive levels in the Debit-Card Relevant Markets;

d.  Verizon was required to pay supracompetitive Debit-Card Interchange Fees for Visa transactions in the Debit-Card Relevant Markets;

e.  Defendants imposed supracompetitive Debit-Card Interchange Fees on Verizon for Visa transactions in the Debit-Card Relevant Markets;

f.  Defendants derived direct and substantial economic benefits from the supracompetitive Debit-Card Interchange Fees for Visa transactions in the Debit-Card Relevant Markets;

g.  But for the anticompetitive conduct of Visa and its Member Banks, competition among banks would have eliminated or greatly reduced the Interchange Fees for Visa transactions in the Debit-Card Relevant Markets; and

      h.   Verizon's specific amount of damages has not yet been determined.

262.    The collectively fixed Interchange Fee is illegal. It is not necessary to accomplish any procompetitive benefit of the Visa Network. Even if some horizontal agreement were necessary to promote the efficiencies of the Visa Network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies. The anticompetitive effects of Visa and its Member Banks' price fixing far outweigh any procompetitive benefits—if any even exist—in the Debit-Card Relevant Markets. The supracompetitive levels of Interchange continue to the present date.

## SIXTH CLAIM FOR RELIEF

### AGAINST MASTERCARD FOR DAMAGES UNDER § 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATIONS OF SHERMAN ACT, § 1, 15 U.S.C. § 1, UNLAWFUL PRICE FIXING OF DEBIT-CARD INTERCHANGE FEES BY MASTERCARD AND ITS MEMBER BANKS

263.    Verizon repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

264.    Throughout the relevant period, the Member Banks of Mastercard — direct horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies among themselves and with Mastercard in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

265.    The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Mastercard's issuing and acquiring members and Mastercard, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Debit-Card Interchange Fees imposed on Verizon in the Debit-Card Relevant Markets.

266.    Mastercard and its Member Banks have and exercise market power in the Debit-Card Relevant Markets.

267.    The Mastercard Board of Directors, which, for much of the relevant time period, included representatives from several Member Banks, acted on behalf of the Member Banks to fix, raise, maintain, or stabilize the Interchange Fees for Mastercard Debit-Card transactions, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

268.    All of the Member Banks of Mastercard have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

269.    The contracts, combinations, and conspiracies alleged herein began before Mastercard's 2006 IPO and have continued after that date. Even after Mastercard's IPO, the banks' membership in Mastercard is contingent upon those banks agreeing to adhere to the anticompetitive Rules and uniform schedule of Default Interchange Fees described herein.

270.    Even after Mastercard's IPO, each Member Bank agrees to adhere to Mastercard's uniform schedules of Default Interchange Fees and knows, understands, and expects that all other Member Banks will agree to abide by the same rules and uniform schedule of default Interchange Fees.

271.    The contracts, combinations, conspiracies, and agreements alleged in this Claim have had, and/or are likely to have, among others, the following anticompetitive effects:

        a.  Actual and potential competition in the Debit-Card Relevant Markets was substantially excluded, suppressed, and effectively foreclosed and thus has been unreasonably restrained;

        b.  Defendants acquired and maintained market power in the Debit- Card Relevant Markets;

    c.   Defendants controlled and maintained Interchange Fees imposed on Verizon and elevated Interchange Fees imposed on Verizon above competitive levels in the Debit- Card Relevant Markets;

    d.   Verizon was required to pay supracompetitive Debit- Card Interchange Fees for Mastercard transactions in the Debit- Card Relevant Markets;

    e.   Defendants imposed supracompetitive Debit-Card Interchange Fees on Verizon for Mastercard transactions in the Debit-Card Relevant Markets;

    f.   Defendants derived direct and substantial economic benefits from the supracompetitive Debit-Card Interchange Fees for Mastercard transactions in the Debit-Card Relevant Markets;

    g.   But for the anticompetitive conduct of Mastercard and its Member Banks, competition among banks would have eliminated or greatly reduced the Interchange Fees for Mastercard transactions in the Debit-Card Relevant Markets; and

    h.   Verizon's specific amount of damages has not yet been determined.

272.   The collectively fixed Interchange Fee is illegal. It is not necessary to accomplish any procompetitive benefit of the Mastercard Network. Even if some horizontal agreement were necessary to promote the efficiencies of the Mastercard Network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies. The anticompetitive effects of Mastercard and its Member Banks' price fixing far outweigh any procompetitive benefits—if any even exist—in the Debit-Card Relevant Markets. The supracompetitive levels of Interchange Fees continue to the present date.

## SEVENTH CLAIM FOR RELIEF

**AGAINST MASTERCARD FOR DAMAGES UNDER SECTION 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATION OF SECTION 7 OF THE CLAYTON ACT, 15 U.S.C. § 18**

273.    Verizon repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

274.    As part of the Restructuring, Mastercard acquired assets of its Member Banks including those banks' equity shares in the Old Mastercard, and attendant rights, such as the right to elect a Board of Directors that sets default schedules of Interchange Fees.

275.    The Restructuring was designed to, and has had the effect of substantially lessening competition in the Relevant Markets in violation of Section 7 of the Clayton Act as more fully described above in at least the following ways:

a.  The Restructuring has created a single New Mastercard with sufficient market power in Relevant Markets to set Interchange Fees at supracompetitive levels;

b.  It allows New Mastercard to establish uniform schedules of default Interchange Fees, which would not exist in a competitive market;

c.  To the extent that it has reduced the likelihood of successful future antitrust enforcement against New Mastercard and its Member Banks, it has removed a significant downward pressure on Interchange Fees;

d.  It has created New Mastercard that is perpetuating the anticompetitive market structure that Old Mastercard and its Member Banks established through collusive agreements, anticompetitive restraints on Merchants (like Verizon), and Mastercard's strategy focused on its largest Issuing Banks; and

e.   By leaving much of the Member Banks' influence in New Mastercard intact, the Restructuring establishes a new forum for collusion among Mastercard's Member Banks.

276.     Verizon has suffered common antitrust injury to their business or property by reason of the violation of Section 7 of the Clayton Act. This acquisition of assets by the New Mastercard and its Member Banks has injured and will continue to injure Verizon by perpetuating an anticompetitive market structure, eliminating any competition that could place downward pressures on price, and by making antitrust enforcement more difficult or impossible.

277.     The harm that Verizon will suffer outweighs any efficiencies that Defendants may argue arises from the Restructuring.

## EIGHTH CLAIM FOR RELIEF

**AGAINST MASTERCARD FOR DAMAGES UNDER SECTION 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**

278.     Verizon repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

279.     The acquisition by Mastercard of the equity interest in Mastercard that, under Old Mastercard, had rested with the Member Banks constitutes a combination within the meaning of Section 1 of the Sherman Act.

280.     The combination has had the effect of harming competition in the Relevant Markets.

281.    The harms to competition that result from the contracts, combinations, conspiracies, and agreements that are part of the Restructuring as more fully described above include at least the following:

a.  The Restructuring has created a single New Mastercard with sufficient market power in the Relevant Markets to set Interchange Fees at supracompetitive levels;

b.  It allows New Mastercard to establish uniform schedules of default Interchange Fees, which would not exist in a competitive market;

c.  To the extent that it has reduced the likelihood of successful future antitrust enforcement against New Mastercard and its Member Banks, it has removed a significant downward pressure on Interchange Fees;

d.  It has created New Mastercard that is perpetuating the anticompetitive market structure that Old Mastercard and its Member Banks established through collusive agreements, anticompetitive restraints on Merchants (like Verizon), and Mastercard's strategy focused on its largest Issuing Banks; and

e.  By leaving much of the Member Banks' influence in New Mastercard intact, the Restructuring establishes a new forum for collusion among Mastercard's Member Banks.

282.    Verizon has suffered antitrust injury to their business or property by reason of the violations of Section 1 of the Sherman Act.

283.    The harm that Verizon will suffer outweighs any efficiencies that Defendants may argue arises from the Restructuring.

### NINTH CLAIM FOR RELIEF

**AGAINST VISA FOR DAMAGES UNDER SECTION 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATION OF SECTION 7 OF THE CLAYTON ACT, 15 U.S.C. § 18**

284.     Verizon repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

285.     As part of the Restructuring, Visa acquired assets of its Member Banks including those banks' equity shares in the Old Visa, and attendant rights, such as the right to elect a Board of Directors that sets default schedules of Interchange Fees.

286.     The Restructuring was designed to, and has had the effect of substantially lessening competition in the Relevant Markets in violation of Section 7 of the Clayton Act in at least the following ways:

    a. It has created a New Visa with sufficient market power in the Relevant Markets to set Interchange Fees at supra-competitive levels;

    b. It allows New Visa to establish uniform schedules of default Interchange Fees, which would not exist in a competitive market;

    c. To the extent that it has reduced the likelihood of successful future antitrust enforcement against New Visa and its Member Banks, it has removed a significant downward pressure on Interchange Fees;

    d. It has created a New Visa that is perpetuating the anticompetitive market structure that Old Visa and its Member Banks established through collusive agreements, anticompetitive restraints on Merchants (like Verizon), and Visa's strategy focused on its largest Issuers; and

e.  By leaving much of the Member Banks' influence in New Visa intact, the Restructuring establishes a new forum for collusion among Visa's Member Banks

287.   Verizon will suffer common antitrust injury to their business or property by reason of the violation of Section 7 of the Clayton Act. This acquisition of assets by the New Visa and its Member Banks has injured and will continue to injure will continue to injure Verizon by perpetuating an anticompetitive market structure, eliminating any competition that could place downward pressures on price, and by making antitrust enforcement more difficult or impossible.

288.   The harm that Verizon will suffer outweighs any efficiencies that Defendants may argue arises from the Restructuring.

## TENTH CLAIM FOR RELIEF

### AGAINST VISA FOR DAMAGES UNDER SECTION 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATION OF SECTION 1 OF THE CLAYTON ACT, 15 U.S.C. § 1

289.   Verizon repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

290.   The acquisition by Visa of the equity interest in Visa that, under Old Visa, had rested with the Member Banks constitutes a combination within the meaning of Section 1 of the Sherman Act.

291.   As part of the IPO and Agreements, Defendant Visa agreed with certain Member Banks to impose the Ownership and Control Restrictions described herein.

292.   The Restructuring was designed to, and has had the effect of harming competition in the Relevant Markets in violation of Section 1 of the Sherman Act.

293.    The harms to competition that result from the contracts, combinations, conspiracies, and agreements that are part of the Restructuring include at least the following:

      a.   It has created a New Visa with sufficient market power in the Relevant Markets to set Interchange Fees at supra-competitive levels;

      b.   It allows New Visa to establish uniform schedules of default Interchange Fees, which would not exist in a competitive market;

      c.   To the extent that it has reduced the likelihood of successful future antitrust enforcement against New Visa and its Member Banks, it has removed a significant downward pressure on Interchange Fees;

      d.   It has created a New Visa that is perpetuating the anticompetitive market structure that Old Visa and its Member Banks established through collusive agreements, anticompetitive restraints on Merchants (like Verizon), and Visa's strategy focused on its largest Issuers; and

      e.   By leaving much of the Member Banks' influence in New Visa intact, the Restructuring establishes a new forum for collusion among Visa's Member Banks.

294.    Verizon has suffered antitrust injury to their business or property by reason of the violations of Section 1 of the Sherman Act.

295.    The harm that Verizon will suffer outweighs any efficiencies that Defendants may argue arises from the Restructuring.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Verizon respectfully prays that this Court:

    A.  Declare, adjudge, and decree that Defendants have committed the violations of the

federal antitrust laws as alleged herein;

B. Pursuant to applicable law, award monetary damages sustained by Verizon for the fullest time period permitted by the applicable statutes of limitations and the settlement and release in In re Visa Check/MasterMoney Antitrust Litigation, in an amount to be proved at trial, attorneys' fees, and costs of suit; and award all other and further relief as this Court may deem just and proper.

## XII.  JURY DEMAND

Verizon hereby demands trial by jury of all issues properly triable thereby.


                                        LOWENSTEIN SANDLER LLP
                                        1251 Avenue of the Americas
                                        17th Floor
                                        New York, NY 10020
                                        (212) 419-5853
                                        Attorneys for Plaintiffs


New York: New York
Dated:  October 17, 2019              By: /s/ Gavin J. Rooney, Esq.